J-S22040-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.L.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: G.M.G., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 13 MDA 2020 |

Appeal from the Decree Entered November 25, 2019
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
86634

BEFORE:   OLSON, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED JUNE 26, 2020**

Appellant, G.M.G. ("Father"), appeals from the decree entered November 25, 2019 that involuntarily terminated his parental rights to his daughter, J.L.R., born 2009 ("Child"), pursuant to the Adoption Act.[1] Additionally, Father's counsel, Emily Cherniack, Esquire, seeks to withdraw her representation of Father pursuant to **Anders v. California**, 386 U.S. 738 (1967), **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009), and **In re V.E.**, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending **Anders** briefing criteria to appeals by indigent parents represented by court-appointed counsel in involuntary termination matters).  We affirm and grant counsel's application to withdraw.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 23 Pa.C.S. §§ 2101-2938.

The orphans' court summarized the procedural history of this matter as follows:

[The Berks County Children and Youth Services ("BCCYS")] first became involved with [Father and Child] in January 2017 due to concerns of Father's drug and alcohol abuse, criminal history, mental health, lack of appropriate parenting and [the] lack of involvement [of T.A.R., Child's mother ("Mother"),] with [C]hild. The family was then opened for In Home Services and Father engaged in treatment with the support of Veteran's affairs. After continued monitoring, the basic needs of the child were being met and the case was then closed by BCCYS in November 2017. On March 16, 2018, BCCYS was notified that [C]hild was participating in a forensic interview during which Father appeared to be under the influence of drugs. Law enforcement took protective custody of the child pending BCCYS response. An emergency petition was filed and the [court] ordered legal custody be transferred to BCCYS. On March 28, 2018, an Adjudication and Dispositional hearing was held in front of this court and legal custody was transferred to BCCYS for placement purposes. Father was present for the hearing. Mother did not attend.

[C]hild was placed with a non-related resource parent as parental grandparents are over age 80 and were not an available option. The primary established goal for Father was reunification. Father was ordered to cooperate with the following: (1) parenting education, (2) mental health evaluation and any additional recommendations, (3) drug and alcohol evaluation and any recommendations, (4) random urinalysis, (5) establishing and maintaining stable housing and income, (6) notify[ing] BCCYS [of] any changes in income or residence, (7) casework services through BCCY[S] and any recommendations, (8) signing releases for all providers and (9) visitation as scheduled and act[ing] in an appropriate manner [during visits].

Permanency review hearings were held on August 28, 2018 and January 29, 2019. At the Permanency Review hearings, it was found that Father was moderately compliant but had made no progress toward alleviating the circumstances which necessitated

> the original placement. On March 19, 2019, the petition for termination of parental rights was filed.[2]
>
> For reunification, the main requirement was for father to obtain and maintain sobriety. During [C]hild's placement, [F]ather had twelve residences including incarceration and four inpatient drug and alcohol treatment programs. He had inconsistent attendance with visits through Open Door International as [a] result of his drug use and incarceration. He was not able to obtain and maintain sobriety. At the time of the termination hearing[, Father] was incarcerated in a state correctional institute, specifically participating in the State Intermediate Punishment Program (SIP) after failing to complete the local Veteran's Court program due to relapse (K2, cocaine and methamphetamine).

Orphans' Court Opinion, 1/17/20, at 4-6 (footnote omitted).

The termination hearing took place on November 18, 2019. Because Father was incarcerated at the time of the hearing, he participated via video conference. Attorney Cherniack represented Father and was present in the court room. Child was represented by Barbara Beringer, Esquire, who served as her guardian *ad litem* ("GAL") and legal interests counsel.[3]

_____

[2] BCCYS filed a petition for termination of parental rights against Mother on that same date. Following a hearing, the orphans' court issued a decree terminating Mother's parental rights to Child on November 7, 2019. Mother did not appeal from that ruling.

[3] In *In re T.S.*, 192 A.3d 1080 (Pa. 2018), our Supreme Court held that "during contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian ad litem representing the child's best interests can also represent the child's legal interests." *Id.* at 1092. At the termination hearing, Attorney Beringer stated that she was able to serve as Child's GAL and legal counsel because no conflict existed between Child's legal interests and her best interests as Child had clearly expressed her preference that Father's parental rights be terminated. N.T., 11/18/19, at 63-64. Father did not argue that there was a conflict between the Child's interests in the orphans' court. *Cf. In re Adoption of*

Father testified that he began using marijuana when he was twenty years old in the military. N.T., 11/18/19, at 6, 40-41. Father later began using crack cocaine and his "addiction progressed pretty seriously to the point that" he was involved in a robbery in 1995, receiving a 9-to-36-month sentence for that conviction. *Id.* at 6-7. Father participated in his first rehab program and was paroled after three months, but then he was recommitted to serve his full sentence after he began using again. *Id.* at 7-8. Father entered into three more rehab programs in the next several years related to cocaine and marijuana use and eventually maintained a period of sobriety from 2002 to 2004. *Id.* at 8-10. Father participated in more rehab programs in 2004 and 2008 and also was incarcerated several times during this period. *Id.* at 10-11.

Father was sober from 2009, the year Child was born, through 2012. *Id.* at 11. During that period, Father and Mother, who were no longer dating, co-parented Child and split physical custody. *Id.* In 2012, Father relapsed on cocaine and served a six-month probation violation term of incarceration. *Id.* at 12. After his release, Father resumed co-parenting responsibilities until 2014 when he assumed sole custody of Child as a result of an incident in which Child was sexually abused by a member of Mother's family. *Id.* at 11-12.

---

*K.M.G.*, 219 A.3d 662, 669-70 (Pa. Super. 2019) (*en banc*) (holding that the Superior Court does not have the authority to review whether a GAL can also serve as a child's legal interests counsel in an involuntary termination of parental rights proceeding if the issue was not raised in the lower court).

In 2014, Father moved with Child to Florida where they remained until 2017. *Id.* at 13. During this period, Father again suffered a drug relapse. *Id.* at 13, 21. After moving back to his parents' house in Pennsylvania with Child, Father cut part of his finger off while working in food service and began receiving workers' compensation benefits. *Id.* at 13-14. During treatment for the injury, Father was prescribed pain killers and he then "started using [illegal drugs] heavily again." *Id.* at 14. Father was arrested twice in the fall of 2017 for driving under the influence ("DUI") and was placed in a Veterans Treatment Court program. *Id.* On March 16, 2018, Father went to a forensic examination interview as part of his participating in that program; as a result of the fact that he was under the influence of K2, a type of synthetic marijuana, during the interview, Child was immediately removed from Father's care and placed in BCCYS's protective custody. *Id.* at 14-15.

Father remained in the Veterans' Treatment Court program after Child's removal; in May 2018, he was incarcerated and placed in a 21-day treatment program at a VA hospital. *Id.* at 16. He relapsed ten days after he completed that rehab program and returned to the program for one month, followed by two more months at an outpatient recovery house. *Id.* He relapsed while in the recovery house, was re-incarcerated, and returned to treatment in December 2018. *Id.* He was removed from the treatment program in March 2019 as a result of a positive drug test for K2, cocaine, and methamphetamine and then taken into custody for violating the terms of his probation related to his 2017 DUI convictions. *Id.* at 5-6, 16.

As of the date of the termination hearing in November 2019, Father was incarcerated in a state correctional boot camp program and he anticipated being released from the program by March 2020. *Id.* at 6, 16. Father planned to move back in with his parents after his release, and he anticipated being able to support Child on a settlement from his workers' compensation claim as well as any income from working. *Id.* at 42-44.

Aimee Halpin, the case worker at Open Door International, the organization that oversaw Child's foster family placement, testified that there were long gaps between Father's visits with Child as a result of his in-patient treatment and incarceration. *Id.* at 25. Halpin stated that, during the visits, Father and Child would joke around and not discuss the serious concerns Child had about their situation, including her concerns related to the long gaps between their visits. *Id.* at 25, 27.

Halpin testified that Father engaged in inappropriate behavior during visits, including discussion of topics that were too adult for Child and "inappropriate touching." *Id.* at 25-27. Several of the visits had to be terminated prematurely as a result of the fact that Father exhibited signs that he was inebriated, such as staring off into space and being non-responsive. *Id.* at 24, 28-29. Father acknowledged that he was under the influence at several of his scheduled visits, but denied that he had engaged in any other inappropriate conduct during the visits. *Id.* at 17, 48-49.

Lauren Howard, Child's BCCYS caseworker, testified that Father had not met his reunification goals, the principal issue being his inability to maintain

sobriety. *Id.* at 30-31. Howard stated that Child is "very bonded" with her foster mother, with whom she has been living since April 2019. *Id.* at 31, 33. The foster mother meets all of Child's needs, and Child has expressed her desire to be adopted by the foster mother. *Id.* at 31-33. Howard described Child's bond with Father as "very unhealthy" as Child is excessively worried about him and has trouble sleeping because of her concerns about him. *Id.* at 31. The foster mother has stated that she would be open to allowing visitation with Father after termination as long as he maintains his sobriety. *Id.* at 32. Howard therefore believed that the termination of Father's parental rights would be in Child's best interests. *Id.* at 32.

Howard testified that Father sent Child many letters enclosing newspaper clippings, photos, and drawings. *Id.* at 36. Father was informed, however, that some of this content was not appropriate for someone of Child's age, including drawings he had made of his body indicating all of the injuries he had suffered over the years. *Id.* at 36-37. Howard also testified that Father had once sent Child a used, dirty sock and asked her to wear it at night so "they could connect to each other." *Id.* at 36. Father acknowledged that he sent the drawing of his body and stated that the sock was intended as a joke, but he testified that he was only informed on one occasion that a letter he sent to Child was inappropriate. *Id.* at 49-50, 54-56.

Attorney Beringer, Child's GAL and legal interests counsel, stated at the hearing that she had met with Child in person and "spoken with her extensively" on the telephone. *Id.* at 64. Child clearly informed Attorney

Beringer that she wanted to be adopted by her foster mother. *Id.* Child understood that Father loves her and she also loves him, but also that he is not in a position to take care of her and instead needs to care for himself. *Id.* Attorney Beringer opined that termination of Father's parental rights was also in Child's best interests because she desperately needs permanency and to be relieved of the burden of worrying about Father and her current foster mother is willing and able to offer permanency to Child. *Id.* at 64-65.

Following the hearing, the orphans' court entered a decree terminating Father's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. Father filed a timely appeal of the decree.[4]

Before this Court can consider the merits of this appeal, we must first determine whether Attorney Cherniack has satisfied the requirements for withdrawal. *Commonwealth v. Yorgey*, 188 A.3d 1190, 1195 (Pa. Super. 2018) (*en banc*); *In Interest of J.J.L.*, 150 A.3d 475, 479 (Pa. Super. 2016). To withdraw, counsel must (1) petition the court for leave to withdraw stating that she has made a conscientious examination of the record and has determined that the appeal would be frivolous; (2) provide a copy of the *Anders* brief to the appellant; and (3) advise the appellant of his right to retain new counsel or proceed *pro se* and to raise any additional points that

---

[4] Father filed a concise statement of errors complained of on appeal concurrently with his notice of appeal on December 24, 2019. The orphans' court filed an opinion on January 17, 2020.

he deems worthy of the court's attention. **Yorgey**, 188 A.3d at 1195-96; **J.J.L.**, 150 A.3d at 479-80.

In the **Anders** brief, counsel must:

(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Commonwealth v. Santiago**, 978 A.2d 349, 361 (Pa. 2009); **J.J.L.**, 150 A.3d at 480. If counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of proceedings before the trial court and render an independent judgment as to whether the appeal is wholly frivolous. **Yorgey**, 188 A.3d at 1196; **J.J.L.**, 150 A.3d at 480.

In this case, Attorney Cherniack filed an application to withdraw, wherein she asserts that she has made a conscientious review of the record and determined that Father's appeal from the involuntary termination of his parental rights to Child would be frivolous. Counsel appended to the application a copy of a February 21, 2020 letter in which she provided Father with a copy of her **Anders** brief and advised him of his right either to retain new counsel or to proceed *pro se* on appeal and raise any points he deems worthy of this Court's attention.[5] In her **Anders** brief, Attorney Cherniack

---

[5] Father did not file a *pro se* response to the application to withdraw or retain counsel to argue on his behalf.

summarized the procedural and factual background of this case, stated that there were no non-frivolous appellate issues, and explained the reasons for this determination. We therefore conclude that Attorney Cherniack has complied with *Anders* and *Santiago* and proceed to a review of the merits of this appeal.

In her *Anders* brief, Attorney Cherniack addressed whether there was clear and convincing evidence to support the orphans' court's involuntary termination of Father's parental rights to Child under Section 2511(a) and (b) of the Adoption Act. Our standard of review of a decree terminating parental rights is limited to determining whether the orphans' court abused its discretion, committed an error of law, and whether its decision is supported by competent evidence. *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019). The petitioner bears the burden of demonstrating grounds for termination by clear and convincing evidence, which "is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted).

Under Section 2511 of the Adoption Act, a court must engage in a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

- 10 -

needs and welfare of the child under the standard of best interests of the child.

*Id.* (citation omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the present case, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one of the grounds for termination identified in Section 2511(a), as well as Section 2511(b). *B.J.Z.*, 207 A.3d at 922. Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

- 11 -

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

To terminate parental rights under Section 2511(a)(2), the following three elements must be met:

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*B.J.Z.*, 207 A.3d at 922 (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *Id.* (citation omitted).

In finding grounds for termination of Father's parental rights under Section 2511(a)(2), the orphans' court stated:

Father has been unable to care for [C]hild primarily as a result of his own decades long struggle with addiction with short periods of sobriety followed by relapse. During the pendency of BCCYS supervision, Father arrived at visitation on more than one occasion admittedly under the influence of a controlled substance; a fact that was physically noticeable to, and commented about, by [C]hild.

Counsel argued that Father loves [C]hild, wants to maintain sobriety for her and has additional supports in place that were not available on prior attempts at sobriety. Father's current incarceration and participation in the State Intermediate Punishment drug treatment program was highlighted as the longest treatment program provided to him. While Father did not take parenting class and is expecting a worker[s'] compensation

- 12 -

settlement upon his release from incarceration, there was absolutely no testimony that Father would eventually be able to perform the actions necessary to assume parenting responsibilities as Father's future success is solely based upon Father's assertion that he can maintain sobriety 'this time' despite being unable to succeed in the past. . . .

For all the reasons stated above, this [c]ourt finds that Father is unable to remedy the causes of incapacity due to his inability to maintain his sobriety during the 19 month time period Child has been in placement and his repeated relapse history in his twenty year drug addiction. Therefore, the [c]ourt finds that termination is warranted under [Section 2511(a)(2)].

Orphans' Court Opinion, 1/17/20, at 7-8.

Upon a careful review of the record, we conclude the orphans' court's termination of Father's parental rights under Section 2511(a)(2) was warranted. Child was initially removed from Father and placed into care in March 2018 when Father showed up with Child, inebriated, to a Veteran's Treatment Court interview. The main goal established by BCCYS for Father's reunification with Child was for Father to achieve and maintain sobriety and also to maintain stable housing and income. From the time that Child was placed into BCCYS's care, Father has been unable to maintain sobriety and consequently has been in and out of prison and rehab facilities. In May 2018, Father was incarcerated and placed in a 21-day treatment program at a VA hospital based on his continued drug use. Father relapsed ten days after completing the program and went back into treatment for three additional months, but relapsed and was incarcerated again. Father entered another treatment program in December 2018, but he was removed in March 2019 based upon another relapse leading to his incarceration in the State

Intermediate Punishment program at the time of the November 2019 termination hearing. Father admitted at the termination hearing that, although he had not given up hope of one day maintaining his sobriety, "[t]o this point" he had not been able to do so. N.T., 11/18/19, at 18.

Accordingly, we discern no error of law nor abuse of discretion in the orphans' court's finding that clear and convincing evidence supported the termination of Father's parental rights pursuant to Section 2511(a)(2). Father's "repeated and continued incapacity" to maintain sobriety left Child without essential care from Father necessary for Child's well-being, and the cause of Father's incapacity – his addiction – "cannot or will not be remedied by him." 23 Pa.C.S. 2511(a)(2); *see also B.J.Z.*, 207 A.3d at 922.

Having resolved that grounds for termination existed under Section 2511(a)(2), we now proceed to the second part of the analysis under subsection (b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. . . . Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of

continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re G.M.S.*, 193 A.3d 395, 401 (Pa. Super. 2018) (citation and brackets omitted). "The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citations and quotation marks omitted). "Ultimately, the concern is the needs and welfare of a child." *In re M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019).

In making its determination that termination of parental rights was appropriate under Section 2511(b), the orphans' court engaged in the following discussion:

> Father certainly has a strong bond with [C]hild and the court has no doubt he is loved in return by [C]hild. Father should be commended for his attempts to maintain his relationship with [C]hild despite his incarceration by sending letters and drawings to her. However, despite parenting classes and guidance by various caseworkers, Father struggles with good judgment in determining what information is appropriate or communicated in an age appropriate manner to [C]hild, as evidenced by his sending her his sock to be used as a comfort object (described by Father as a 'sock puppet') or his letter in which he described his crying or a skeleton illustration with his various maladies marked. While he intended for them in a positive manner and to soothe [C]hild and her worries about him, it had the opposite effect. Unfortunately, his contact, and that with his parents, have resulted in anxiety for [C]hild exhibited by bed wetting and nightmares as [C]hild continues to worry about [F]ather's health and shouldering his emotional burden. This court has taken into account the natural parental bond existing between [C]hild and Father. Since the resources mother would be open to contact with Father and paternal grandparents, if Father does in fact maintain

his sobriety, the termination of Father's parental rights would not destroy an existing, necessary and beneficial relationship. The testimony and evidence demonstrated that [C]hild has bonded strongly with the foster mother and [C]hild's need for stability, love, security and comfort are amply provided in the foster home. [C]hild has verbalized her desire to be adopted by her resource parent to her [GAL]. [C]hild has been described as feeling caught in the middle as she loves both her [F]ather and her resource parent but wants to stay with her resource parent. The court gave adequate consideration to the needs and welfare of [C]hild and prioritizes her need for stability over Father's desire to parent by allowing the termination of Father's parental rights and allowing [Child] to be available for adoption by foster mother with whom she has bonded and looks to for her needs to be met. The testimony credibly establishes a strong bond with a resource who would continue to act with the best interests of the child in mind.

After reviewing the testimony and considering the exhibits, this [c]ourt finds that [C]hild is in a safe and suitable environment and that termination will not be detrimental to [C]hild. . . .

Orphans' Court Opinion, 1/17/20, at 9-10 (citation omitted).

Having comprehensively reviewed the record, we conclude that the orphans' court did not err or abuse its discretion in finding that the termination of Father's parental rights best served the needs and welfare of Child. While Father had a strong bond with Child, this fact alone does not preclude the termination of Father's parental rights. *N.A.M.*, 33 A.3d at 103. Testimony at the hearing showed that the bond between Father and Child was "very unhealthy," N.T., 11/18/19, at 31, as demonstrated by Father's inappropriate communications with Child and Child's excessive concern for Father's well-being and negative behavioral changes following visits with Father. Father himself recognized that Child is "more worried about me than she should be.

She's being an adult. She doesn't need to be. She needs to be a kid." *Id.* at 17.

By contrast, Child's BCCYS caseworker testified that Child is "very bonded" with her foster mother and the foster mother meets all of Child's needs. *Id.* at 31.[6] As the orphans' court explained, the foster mother was also amenable to visitation with Father following adoption if Father maintains his sobriety. Furthermore, Child expressed to her GAL and counsel her preference for termination of Father's parental rights to allow for her adoption by the foster mother, even though she loves Father and has great concern for him.

At the termination hearing, Father cited the "unbreakable" bond between him and Child and requested that the orphans' court provide him with more time to address his issues and allow him to "be the person I was when I first had custody of her." *Id.* at 53. The orphans' court, however, was not required to prolong the instability for Child merely based upon the hope that Father may potentially rectify his substance abuse issues at some point in the future. As our Supreme Court has observed, when conducting a needs and welfare analysis under Section 2511(b), "courts must keep the ticking clock of childhood ever in mind" and remain cognizant of the fact that "[c]hildren

_____

[6] The agency petitioning for the termination of parental rights is not required to retain an expert to perform a formal bonding analysis, and the orphans' court is "free to rely upon the assessments of social workers and caseworkers" to assess the bond between a child and her parents or caregivers. *In re J.N.M.*, 177 A.3d 937, 944-45 (Pa. Super. 2018).

are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *See In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2019).

In sum, we agree with Attorney Cherniack that Father's appeal from the denial of his termination of parental rights to Child are frivolous. We have independently reviewed the record and find no other issues of arguable merit that Father could pursue on appeal. Accordingly, we affirm the orphans' court decree and grant counsel's application to withdraw.

Decree affirmed. Application to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/26/2020