J-S34009-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: I.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 126 MDA 2020 |

Appeal from the Decree Entered December 20, 2019
In the Court of Common Pleas of Northumberland County
Orphans' Court at No(s):  20 of 2019

| | | |
|---|---|---|
| IN RE: M.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 127 MDA 2020 |

Appeal from the Decree Entered December 20, 2019
In the Court of Common Pleas of Northumberland County
Orphans' Court at No(s):  21 of 2019

| | | |
|---|---|---|
| IN RE: J.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 128 MDA 2020 |

Appeal from the Decree Entered December 20, 2019
In the Court of Common Pleas of Northumberland County
Orphans' Court at No(s):  22 of 2019


BEFORE:  PANELLA, P.J., BENDER, P.J.E., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, P.J.:                    **FILED NOVEMBER 13, 2020**

L.W. ("Mother") appeals from the December 20, 2019 order involuntarily terminating her parental rights to her three minor children, I (born in 2006), J (born in 2007), and M (born in 2017). We affirm.

At the outset, we note that I and J have the same biological father, R.W. In contrast, R.W. was the legal, but not the biological, father of M. R.W.'s parental rights were also involuntarily terminated as to all three children, but R.W. has not appealed that termination.

The trial court summarized the history of Mother and the children's involvement with Northumberland County Children and Youth Services (the "Agency") as follows:

> [The Agency] became involved with [the] family in 2013 after receiving a referral involving sexual abuse of the minor child [J]. The allegation was that [J]'s father[,R.W.,] had been sexually abusing her. A safety plan was implemented so that … R.W. was not allowed to have any unsupervised contact with the minor children. The [child protective services] referral was indicated against … R.W. [R.W.] never appealed the indicated report [and failed to participate in a sex offender treatment program]. It was reported to [the Agency] that [R.W.] had relocated to Pittsburgh. Mother … expressed that she wanted to move to be with [R.W.]
>
> Mother signed [a] Family Service Plan in March 2014. Mother appeared to be struggling both financially and mentally and it was recommended [that she attend counseling] [and] classes at the Family Center and [be assigned] a resource worker. Mother refused all services.
>
> Maternal Grandmother contacted the Agency in June of 2014, expressing concern about Mother paying bills and providing food for the children. In July [of 2014,] Mother took the children to visit [R.W.] in Pittsburgh. Mother confirmed that she had taken

- 2 -

the children to Pittsburgh. Mother also admitted that she had left the children alone with her father [the children's maternal grandfather] even though he had sexually abused [Mother] as a child. When questioned why she left the children with her father she responded that she now trusts him. Allegheny County filed two [child] [p]rotective [s]ervice reports that the children were at imminent risk of sexual abuse and named both parents as perpetrators. Mother was requested to sign a safety plan and she refused. Several family members were discussed as options for places for the children to stay, however, they were all deemed inappropriate or unwilling to take the children. During this time[,] Mother made statements that no matter where the children were she would take them and flee to Pittsburgh.

A [r]isk assessment was done [and] … [t]he children were deemed to be at high risk of future potential abuse/neglect …[.] A safety assessment was also conducted and there were safety threats identified due to Mother failing to assure the [children's] safety and there was a high likelihood of abuse.

On July 29, 2014, [the Agency] was granted a verbal [o]rder granting temporary legal and physical custody to the Agency. On that same day[,] while the children were being transported to the foster home[,] they disclosed that while in Pittsburgh[, they] had slept in the same bed as [R.W.] They also indicated that they had spent time with their maternal grandfather and had slept in the same bed with him.

A shelter care hearing was scheduled for August 1, 2014, at which time the parents stipulated to the children remaining in care. The adjudication hearing was held on August 7, 2014, and the children were adjudicated dependent.

Subsequent to placement[,] the children disclosed sexual abuse perpetrated by [their] maternal grandfather. A child protective services report indicated [the] maternal grandfather as perpetrator by commission of sexual abuse of … [J]. Mother was indicated as perpetrator by omission. Neither party appealed the indicated reports against them.

During this initial placement[,] Mother completed parenting classes, [counseling] services and maintained a home and employment. Mother was cooperative with the psychologist in developing a plan for protection of the children and transition back

- 3 -

to her custody[,] which was accomplished[,] and the case was closed by November 9, 2017.

The Agency received a report on January 24, 2018 that [M]other had taken the children to be around [R.W.] again. This was confirmed by the children. Mother indicated she did not see the harm in [allowing contact between the children and R.W.] due to her case being closed. Due to ongoing concerns about Mother's protective capacities[,] the Agency sought another verbal order that was granted on January 24, 2018. A shelter care hearing was held on January 26, 2018, and an [a]djudication hearing on February 9, 2018, where it was determined that physical and legal custody of the children [would] remain with [the Agency].

Since the adjudication hearing[,] [p]ermanency [r]eview hearings were held July 13, [2018], December 17, 2018, April 2, 2019, July 8, 2019 and October 4, 2019.

Trial Court Opinion, 4/2/20, at 1-4 (unpaginated).

On April 29, 2019, the Agency filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511 (a)(1), (a)(2), (a)(5) and (a)(8) and (b). A two-day hearing was held on the petition, on October 17, 2019 and December 9, 2019.

Mother testified on the first day of the hearing. She stated that she understood that the first placement of her children had occurred because she had allowed her children to have unsupervised contact with R.W. after there had been an indicated report that he had sexually abused J. *See* N.T., 10/17/19, at 64-65. She testified that she believed J's allegations that R.W. had sexually abused her, and in fact, she had been the one to report the abuse. *See id*. at 80, 64. She further testified that after the children were returned to her care, the Agency reviewed service plans with her and she was

clear that the Agency was recommending that the children were not to have contact with R.W. because of the sexual abuse. *See id*. at 66-68. Mother admitted, however, that she allowed contact between the children and R.W. after the case was closed. *See id*. at 65-66, 71.

Indeed, the family service plan dated November 9, 2017, which Mother signed, not only prohibited Mother from allowing contact between R.W. and the children, but also prohibited Mother from allowing contact between the maternal grandfather and the children. *See* Service Plan, Exhibit A-2, at F-1. Mother also testified that she knew that there had been an indicated report of sexual abuse involving her father and the children. *See* N.T., 10/17/19, at 65. She testified that she understood there was not supposed to be contact between her father and the children because of the abuse, but that she allowed for such contact anyway. *See id*. at 66, 73, 74.

Mother testified that she did not see the danger in the children's contact with R.W. or the trauma such contact may have caused the children. *See id*. at 71. According to Mother, it was not until she started therapy in May of 2019 with a woman named Beverly Elps that she was able to understand the potential harm of allowing those who had abused the children to have contact with them. *See id*. at 72; *see also* Gillum Psychological Evaluation, 5/24/19, at 3 (reporting Mother's statement that she had "been in a program for [six] weeks. It opened my eyes. My kids come first."). Mother also testified that

although she continued a physical relationship with R.W. until March of 2019, she has since filed for divorce. *See* N.T., 10/17/2019, at 83, 86-87, 79.

The Agency also called Michael Gillum, who all parties stipulated was qualified as an expert in the field of psychology, to testify at the hearing on October 17, 2019. Gillum reported that he conducted a risk assessment psychological evaluation on Mother to determine her ability to protect her children from abuse. Gillum acknowledged that Mother "seemed to love her children" but that her "judgment was problematic." *Id*. at 20-21. He noted that Mother had "continuously fail[ed] to protect" the children by engaging in a "repeated pattern over a long period of time of[,] despite being told not to put the kids at risk by placing them with people who could potentially molest them, she continued to do it." *Id*. at 28, 22-23.

Gillum believed Mother had dependency issues, in that she tended to defer her decisions to others she had become submissive to, and prioritized her relationship with men over the safety of her children. *See id*. at 26, 24. He essentially concluded that Mother was likely to continue to tolerate mistreatment of herself or her children because it was more important to her to preserve her relationship with a man than it was to protect her children. *See id*. at 27.

Gillum testified that he was "confident" that Mother could not be relied upon to protect the children, as Mother could not be counted on to refrain from putting the children "back in the care of one of these individuals who

may have molested them, or might molest them." ***Id***. at 28. It was Gillum's opinion that if Mother "had custody or unsupervised visitation [the children] would be at great risk of sexual abuse." ***Id***. at 29. When asked by Mother's counsel whether it was his position that Mother could not remedy these concerns, Gillum responded:

> Yes. My position is that having discussed this with her, and reviewed the history, she has had many opportunities where these issues have been discussed with her at length over the years and she rejected getting any type of treatment, trying to make changes … Her revelation was that she now needed to put her children first. I didn't find that credible. … I would say within the … foreseeable future, I don't believe she would make adequate changes to protect her children from potential perpetrators.

***Id***. at 46.

Mother presented her own expert, Dr. Frederick Gimino, a licensed psychologist, to testify at the hearing on December 9, 2019. Dr. Gimino testified that his evaluation of Mother was limited to a neuropsychological evaluation to determine whether Mother had any neuropsychological issues which would impede her ability to protect the children and was not done to determine anything to do with custody. ***See*** N.T., 12/9/2019, at 5, 18, 22. Dr. Gimino acknowledged that he met only with Mother and not the children. ***See id***. at 17. He testified that he concluded that Mother did not have any neuropsychological impairments, *i.e*. she did not "have anything wrong with her brain." ***Id***. at 22. Although Dr. Gimino did agree that his report recommended that Mother be allowed to continue to develop her relationship with her children by gradual transitions, he also testified:

I didn't judge [Mother] in terms of her abilities to be a good parent, whether or not she was a threat to her children. I just said her mental health status was not contributing to these problems with her.

*Id*. at 30.

Following the hearing, the trial court issued an order involuntarily terminating Mother's parental rights as to each one of her minor children, I, J and M, pursuant to Sections 2511 (a)(1), (a)(2), (a)(5), (a)(8) and Section 2511 (b). Mother filed a timely notice of appeal on January 14, 2020, and raises two issues in her appellate brief:

I. Whether the trial court erred and/or abused its discretion in its determination that [the Agency] presented clear and convincing evidence to terminate Mother's rights under 23 Pa.C.S.A. § 2511(a)(1), 2511 (a)(2), 2511 (a)(5) and 2511 (a)(8)?

II. Whether the trial court erred and/or abused its discretion by determining that [Mother] failed to remedy the conditions that led to placement?

Appellant's Brief at 9.

When this Court reviews an order of a trial court terminating parental rights, we must accept the findings of fact and credibility determinations of the trial court as long as the record supports them. *See In the Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020). If the findings of fact are supported by the record, this Court may only reverse the order if the trial court made an error of law or abused its discretion. *See id*. We may not reverse merely because the record could support an alternate result. *See id*. Instead, we give great deference to the trial court because trial courts often

have the opportunity to observe the parties first-hand over the course of multiple hearings. *See In the Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017). Further, the trial court, as the fact-finder, is free to believe all, part or none of the evidence presented and is likewise free to resolve any conflicts in the evidence. *See id*.

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. Under Section 2511, a trial court must engage in a bifurcated process prior to terminating parental rights. *See In re L.M*., 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the trial court must find that the party seeking termination has proven by clear and convincing evidence that the parent's conduct satisfies any one of the eleven statutory grounds set forth for termination under Section 2511 (a). *See id.;* 23 Pa. C.S.A. § 2511 (a)(1-11). If the trial court finds that one of those subsections has been satisfied, it must then, pursuant to Section 2511(b), make a determination of the needs and the welfare of the child under the best interests of the child standard. *See In re L.M.*, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(b).

Here, regarding the first prong of the analysis, the trial court found that the Agency had proven by clear and convincing evidence that Mother's conduct met the grounds for termination of her parental rights under Sections 2511 (a)(1), (a)(2), (a)(5) and (a)(8). Mother does not challenge the subsections individually, but rather makes the broad assertion that the trial court erred by

terminating her parental rights under the umbrella of all four. This Court has made clear that it only needs to agree with the trial court that the Agency met its burden as to any one subsection in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We conclude that the trial court correctly determined that the Agency met its burden pursuant to Section 2511 (a)(2), which provides that parental rights may involuntarily be terminated on the grounds that:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa. C.S.A. § 2511(a)(2).

Accordingly, under Section 2511(a)(2), parental rights may be terminated if it is shown that: 1) there was repeated and continued incapacity of the parent; 2) such incapacity caused the children to be without essential parental care; and 3) the incapacity cannot or will not be remedied. *See In re N.A.M*., 33 A.3d 95, 100 (Pa. Super. 2011). "Parents are required to make diligent efforts towards the *reasonably prompt* assumption of full parental responsibilities." *Id*. (emphasis added).

Here, the trial court noted that the children had first been adjudicated dependent because Mother had left the children unsupervised with R.W. even though she was aware of the indicated report that R.W. had sexually abused their daughter. The court also pointed out that Mother had left the children

unsupervised with their maternal grandfather, who had sexually abused Mother when she was a child, and it was subsequently disclosed that the grandfather had also sexually abused the children.

The court then noted that after the children were returned to Mother's care, Mother again allowed the children to have contact with R.W. Mother testified that she did not see this as an issue because the case had been closed. The Agency, concerned that Mother did not have the capacity to protect her children, once again sought to have the children adjudicated dependent, and ultimately sought to terminate Mother's parental rights.

In support of the termination, the trial court also pointed to the testimony of Michael Gillum, whose "observations and opinions [the court found] to be entirely consistent with the court's observations and findings." Trial Court Opinion, 4/2/20, at 7 (unpaginated). Namely, the court highlighted the testimony of Gillum that Mother's judgment was problematic, that she was willing to tolerate her children being mistreated in order to preserve her relationship with others, and that the children would be at great risk of sexual abuse if returned to Mother's care. Gillum clearly testified that it was his opinion that Mother could not remedy her incapacity to protect her children from abuse. **See** N.T., 10/17/19, at 46.

Based on the above, we find that there is sufficient evidence in the record to support the court's conclusion that Mother's continued incapacity to protect her children by exposing them to others who have harmed them, or

may harm them, cannot or will not be remedied. This Court has clearly held that the grounds for terminating parental rights under Section 2511 (a)(2) include the incapacity to perform parental duties. **See In re N.A.M**. 33 A.3d at 100. Undoubtedly, "the parental duty extends beyond mere restraint from actively abusing a child; rather, there exists a duty to protect the child from the harm others may inflict." **In the Interest of JOV**, 686 A.2d 421, 423 (Pa. Super. 1996). Mother has repeatedly failed to do so here and there was testimony credited by the trial court that Mother lacked the capacity to protect her children from future harm. As such, we see no error of law or abuse of discretion in the trial court's conclusion that the Agency presented clear and convincing evidence that Mother's parental rights were properly terminated under Section 2511 (a)(2).

In her second issue, however, Mother argues that while she has made poor decisions in the past, the "intensive counseling in 2019" made her realize "the dangers her children were put into by meeting their natural father." Appellant's Brief at 16. Thus, Mother appears to argue that she has already remedied the conditions that led to placement - or at least that she is now willing to do so - and termination of her parental rights is therefore improper. We disagree.

In the first place, Mother, along with I and J, have been involved with the Agency since 2013. Over the years, Mother has repeatedly allowed the children to have contact with people she knows to be sex abusers. By her own

- 12 -

admission, Mother did not recognize the danger in doing so until she began her therapy in May of 2019, after the termination petition had already been filed and six years after her involvement with the Agency began. As this Court has stated:

> A child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In the Interest of D.R.-W*., 227 A.3d at 914 (citation omitted); *see also In re B.L.L*., 787 A.2d 1007, 1013 (Pa. Super. 2001) (stating that parents who cannot or will not meet parental requirements of care within a reasonable amount of time following state intervention may properly have their rights terminated).

In any event, Gillum testified that he simply did not credit Mother's claim that she had an "epiphany" as a result of the counseling beginning in May of 2019 that she now knew she had to put the children first. N.T., 10/17/19, at 47. He explained:

> I didn't find that credible that she had a revelation in 2019, after years of this, that she should put her children first. … [S]he did not demonstrate remorse, or did not talk about mistakes she had made in the past. … She just made the statement … that she needed to [put the children first] so everything would be okay now.

*Id*. Moreover, Gillum testified that:

> [W]ith the depth and severity of the issues [Mother] has, to tell me that she went to informal counseling for six weeks [referring to the therapy with Beverly Elps in 2019] and now saw the light,

- 13 -

and was completely changed. That's pretty much impossible for someone with this degree of problems to say.

*Id*. at 48-49. Gillum acknowledged that it was his understanding that Mother continued to be in therapy with a licensed psychotherapist. He testified that while he was unable to predict the future, he still could not "be very optimistic about the prognosis of [Mother] reaching a point where we would feel she no longer represents a threat to her children, protecting her children." *Id*. at 49-50.

The trial court specifically found the testimony of Gillum credible, testimony which clearly refutes Mother's argument that she has remedied the conditions that led to placement. Mother essentially argues that the trial court should not have credited Gillum's opinions because he conducted only a three-hour interview with Mother and a 45-minute long interview each with I and J, and because Gillum consulted the Agency solicitor reports which contained inaccuracies and hearsay. The court, however, was well aware of what Gillum relied upon in order to reach his conclusions. *See id*. at 18-19, 34-35; Gillum Psychological Evaluation, 5/24/19, at 2-6 (unpaginated) (discussing the interview with each L.W., I and J, the observation of Mother visiting with the children, and the administration of mental health/personality testing). With that knowledge before it, the court credited Gillum's opinions and conclusions, as was its clear prerogative to do. *See In the Interest of D.F.*, 165 A.3d at 966.

Mother also appears to contend that the court's reliance on Gillum's opinion that she had not remedied the conditions that led to placement was improper because her expert, Dr. Gimino, offered the contrary "opinion that these conditions could or may be remedied at this point." Appellant's Brief at 18. This claim is without merit.

As an initial matter, Mother misrepresents the testimony of Dr. Gimino. Dr. Gimino testified only that if Mother continued therapy "she may make progress," N.T., 12/7/2019, at 18, and that "it was difficult to answer" whether she would ever be able to have the protective capacity to take care of the children. *Id*. at 13. He did not at any point testify that Mother had remedied - or that she would remedy - the conditions that led to the children's placement. The thrust of Dr. Gimino's testimony was, in essence, that Mother did not have any neuropsychological issues that were the source of her inability to ensure the children's safety by not allowing them to have contact with those who had sexually abused them.

Moreover, even if there was a conflict in the experts' testimony in the manner alleged by Mother, it was within the province of the trial court, as fact-finder, to resolve any such conflict as it deemed proper. **See In the Interest of D.F.**, 165 A.3d at 966. As noted above, the trial court credited Gillum's testimony, which supports the trial court's finding that Mother has evinced a continued incapacity to protect her children which cannot be remedied. Mother has simply failed to demonstrate that the trial court erred or abused its

discretion by finding that there was clear and convincing evidence that Mother's parental rights should be terminated pursuant to Section 2511 (a)(2).

Because we find that the trial court properly terminated Mother's rights under Section 2511(a)(2), we must next review the trial court's determination pursuant to Section 2511 (b) that termination was in the best interests of I, J and M. Mother does little to challenge this determination. She merely asserts that the Agency "has not provided evidence to show that termination would be in the best interest of the minor children." Appellant's Brief at 15. We disagree.

At the hearing, all counsel stipulated that all three children were in placement with foster parents who were a permanency option. Counsel also stipulated that if the Agency called the caseworker currently involved with the children to the stand, the caseworker would testify that J and I were reluctant to visit with Mother. *See* N.T., 12/9/19, at 34. She would also testify that M, who has been in the Agency's custody since she was seven months old, clearly preferred her foster father to Mother during visits and that M is obviously bonded to her foster father. *See id*. at 35.

All counsel also stipulated that if the Agency called I and J's foster mother to the stand, she would testify to the children's improved academic performance and how they had generally blossomed since being in her care. *See id*. at 38. Following these stipulations, both the appointed guardian *ad*

*litem* and counsel for the children argued for termination of Mother's parental rights to all three children. ***See id***. at 42-43; ***see also*** Brief of Legal Counsel for the Children at 6 ("All of the children desire to be adopted by their foster parents, where they have found the safety and security that they deserve.").

Gillum also testified at the hearing that I had stated during their interview that he did not wish to see Mother and that he loved his foster parents. ***See id***. at 37. The trial court further noted:

> Gillum's report from his interview with the children was that both [I] and [J] were bonded with their foster family. Gillum clearly indicated Mother's lack of protective capacity of the children and urged the court to consider termination of her parental rights. Indeed[,] it was Gillum's opinion to a reasonable degree of scientific certainty that the children would be at extreme risk of sexual abuse should Mother retain unsupervised visits or custody.

Trial Court Opinion, 4/2/20, at 8 (unpaginated).

Based on all of the above, we simply do not agree with Mother's bald assertion that there is insufficient support in the record for the trial court's determination that it was in the best interests of I, J and M to have Mother's parental rights terminated.

We note that while Mother does assert that "she cares for [her] children," Appellant's Brief at 15, and also note that Gillum testified that Mother seemed to love her children, this Court has held that the mere existence of a parent's emotional bond to her children does not preclude the termination of her parental rights. ***See In re N.A.M***., 33 A.3d at 103. Rather, in evaluating the needs and welfare of the children, the trial court can also

look to the safety needs of the children and the love, comfort, security and stability the children have with their foster parents. ***See id***. The trial court did so here, and concluded that under the circumstances of this case, termination of Mother's parental rights was in the best interests of the children. Mother has not shown, nor do we find, that the trial court erred or abused its discretion in reaching this conclusion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/2020