**In re N.A.M.,**

**Appeal of R.H., Mother, Appellant.**

**In re N.J.M.,**

**Appeal of R.H., Mother, Appellant.**

**In re N.H.,**

**Appeal of R.H., Mother, Appellant.**

**In re N.B.,**

**Appeal of R.H., Mother, Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 15, 2011.

Filed Nov. 14, 2011.

---

Betty A. Simon, Philadelphia, for appellant.

Angela L. Yancey and Cynthia N. Keller, Philadelphia, for Department of Human Services, appellee.

Eddie L. Clark, III, Philadelphia, for father of N.A.M. and N.J.M., appellees.

Harry F. Feinberg, Philadelphia, for father of N.H., appellee.

Beverly R. Perry, Philadelphia, for father of N.B., appellee.

BEFORE: BOWES, SHOGAN, and FREEDBERG, JJ.

OPINION BY BOWES, J.:

R.H. ("Mother") appeals the orphans' court decrees entered on December 15, 2010, wherein the court terminated her parental rights to N.A.M., N.J.M., N.H., and N.B. pursuant to the Adoption Act.[1] We affirm.

Philadelphia Department of Human Services, Children and Youth Division ("DHS") became involved with this family during October 2003 because Mother lacked stability and family support to help her care for the three children she had at that time, a son who is not involved in these adoption proceedings and two daughters, N.A.M., born June 12, 2002, and N.J.M., born July 2, 2003. DHS re-moved the children from Mother's care during February 2004, but after Mother completed the required services, her daughters were returned during spring 2006. Mother gave birth to a third daughter, N.H., on January 1, 2006. DHS intervened again shortly after she had a son, N.B., on June 14, 2007, upon receiving a report that both Mother and N.B. tested positive for illegal substances following his birth. The children remained in her care, but DHS provided services.

Three months later, on September 13, 2007, DHS received a substantiated emergency protective services report that Mother physically and verbally abused the children. The report indicated that Mother was observed striking the children and cursing at them. In fact, Mother not only admitted to inflicting corporal punishment upon N.A.M. as a form of discipline, but she also asked a service provider to remove N.J.M. from the family home because she was afraid that she might injure her.

After the children were removed from Mother's care, the juvenile court ordered supervised visitation and directed Mother to participate in urine screens administered by the court's clinical evaluation unit. Mother tested positive for cannabinoids on September 13 and 17, 2007, and a September 25, 2007 screen revealed both cannabinoids and PCP.

On September 27, 2007, the juvenile court adjudicated N.A.M., N.J.M., N.H., and N.B. dependent and DHS placed the children in their respective pre-adoptive foster homes. The three girls reside together, while N.B. lives with a separate pre-adoptive family. DHS designed a Family Service Plan ("FSP") in order to address Mother's drug and alcohol abuse,

1. The orphans' court also terminated the parental rights of the children's respective fa-thers, L.M., J.V., and J.B. The fathers are not parties to this appeal.

mental health needs, anger control problem, and poor parenting skills. In addition, the FSP directed Mother to maintain stable housing and regularly attend visitation. Mother's compliance with the FSP goals was moderate; e.g., it took Mother approximately two years to complete a twelve-week parenting course, she finished only the initial stages of her drug and alcohol program and mental health treatment, and she never provided DHS documentation that she completed a six-to-eight-week anger management program.[2]

On May 29, 2009, DHS filed petitions to change the children's placement goals to adoption and for the involuntary termination of Mother's parental rights. The four petitions for involuntary termination of Mother's parental rights alleged that termination would best serve each child's needs and welfare pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). During the evidentiary hearing, DHS presented its supervising caseworker, a case manager from a service provider that was commissioned to address Mother's substance abuse and mental health needs, and the children's foster care caseworkers. Mother testified on her own behalf. On December 15, 2010, the trial court entered the underlying orders wherein it granted DHS's petitions to involuntarily terminate Mother's parental rights to N.A.M., N.J.M., N.H., and N.B. pursuant to § 2511(a)(1), (2), (5), and (8).[3]

Mother filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On appeal, Mother claims that the or-

phans' court erred in finding that DHS established the statutory grounds to terminate her parental rights pursuant to 23 Pa.C.S. § 2511(a) and (b). The crux of Mother's complaint is that the orphans' court ignored the evidence she presented to demonstrate her love for the children and her compliance with the FSP goals and objectives. Mother also assails the orphans' court's finding that DHS established by clear and convincing evidence that terminating her parental rights would be in the children's best interest when a formal bonding evaluation was not performed.

■ In In re Adoption of L.J.B., 18 A.3d 1098, 1107 (Pa.2011), our Supreme Court recently reiterated the pertinent standard of review regarding an order terminating parental rights as follows:

In cases concerning the involuntary termination of parental rights, our review is limited to a determination of whether the decree of the termination court is supported by competent evidence. Adoption of B.D.S., 494 Pa. 171, 431 A.2d 203, 207 (1981). The party petitioning for termination "must prove the statutory criteria for that termination by at least clear and convincing evidence." In re T.R., 502 Pa. 165, 465 A.2d 642, 644 (1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise

---

**2.** Mother claims that she completed an intensive outpatient drug and alcohol program with Northeast Treatment Center during October 2009 and has been attending Warren E. Smith for outpatient mental health services since her initial involvement with DHS. However, since Mother failed to document her purported achievements with DHS, the certi-

fied record does not support either of her assertions.

**3.** On the same date, the trial court entered juvenile court orders granting DHS's concomitant petitions to change the children's respective goals to adoption. Mother did not appeal those orders.

facts in issue." *Matter of Sylvester*, 521 Pa. 300, 555 A.2d 1202, 1203–04 (1989). As the ultimate trier of fact, the orphans' court is empowered to make all determinations of credibility, resolve conflicts in the evidence, and believe all, part, or none of the evidence presented. *In re A.S.*, 11 A.3d 473, 477 (Pa.Super.2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id.*

Requests to terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the

services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The test for terminating parental rights consists of two parts. In *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007), we explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convinc-

ing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

■ We must agree with the trial court's decision as to only one subsection of 23 Pa.C.S. § 2511(a) in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super.2004) (*en banc*). Herein, we agree with the trial court's decision to terminate Mother's parental rights pursuant to subsections 2511(a)(2) and (b). Accordingly, we do not address the remaining subsections of the statute.

■ Contrary to Mother's protestations, the certified record supports the trial court's determination that DHS presented clear and convincing evidence to involuntarily terminate Mother's parental rights pursuant to Section 2511(a)(2), due to a parental incapacity that cannot be remedied. The grounds for terminating parental rights under Section 2511(a)(2) are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super.2002). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id.* at 340.

In *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), our Supreme Court first announced the fundamental test in terminating parental rights pursuant to section 2511(a)(2). According to *Geiger*,

three things must be shown before a natural parent's rights in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*Id.* at 173–174; *see also In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super.1998).

During the evidentiary hearing, DHS supervisor Latiffany Taylor testified as the custodian of the family's DHS file. N.T., 11/4/10, at 11–15. Ms. Taylor outlined Mother's FSP objectives and characterized Mother as minimally compliant. *Id.* at 17. For example, while Mother satisfied her initial requirement to receive mental health services, she was discharged from subsequent mental health and substance abuse programs due to her obdurate noncompliance and disrespectful behavior. *Id.* at 19–20. In addition, Mother frequently leveled spurious complaints against DHS and threatened at least one of the family's former caseworkers. *Id.* at 21, 74.

During cross-examination, Ms. Taylor further explained that although Mother said she engaged in anger management classes, she never provided the agency any documentation that she completed the programs. *Id.* at 31, 33. Indeed, Mother only provided a single certificate of completion to the agency, which related to her rehabilitation efforts. *Id.* at 31. Specifically, Mother documented completing the initial stages of her drug and alcohol treat-

ment, but she never finished that program. *Id.* at 33. Likewise, Mother only completed one of the two courses DHS asked her to participate in to address her parenting issues, and it took Mother two years to complete that twelve-week course. *Id.* at 32–33.

Moreover, as it relates to Mother's substance abuse, Valerie Ferguson, the clinical supervisor and therapist from Men and Women for Human Excellence, testified that Mother began treatment with her on January 13, 2010, seven months **after** DHS filed the underlying petition to terminate her parental rights. *Id.* at 39–40, 44. Furthermore, after Mother participated in the program for three months, she was discharged prior to clinical completion due to her failure to appear for thirty days. *Id.* at 45–46. The only rationale Mother proffered for her non-compliance was her stress related to ongoing parenting classes, legal matters concerning one of her daughters, and her health concerns. *Id.* at 46. Furthermore, Mother's attempted re-admission into the program failed when she tested positive for marijuana and PCP, and she declined to appear for the second portion of the two-part admission process. *Id.* at 47–48. Nevertheless, Mother subsequently attempted to participate in a closed group-therapy session but she was not permitted to attend. *Id.* at 47. Although mental health services were available to Mother at Men and Women for Human Excellence, she never requested services to address her mental health issues or reported any history to Ms. Ferguson to indicate that she needed such services. *Id.* at 49.

Next, Ayanna McFadden, the children's former foster care case manager, testified about Mother's disturbing behavior during her visitations with N.A.M., N.J.M., N.H., and N.B. Ms. McFadden supervised more than forty of Mother's semi-monthly visita-

tions with the children between September 2007 and June 2010. *Id.* at 53. She characterized the quality of the visitations as "okay" and noted that Mother would become upset during the visitations and would require redirection. *Id.* at 54.

In discussing Mother's demeanor during visitations generally, Ms. McFadden explained, "Usually the visit would start out good. They would be playing and then [Mother] would become upset. Like the smallest thing can make her upset. And I would have to end the visits early sometimes because of that. She just gets really upset." *Id.* at 59. For example, on one occasion, N.H. angered Mother for engaging in activities typical of other three-year-old children and Mother resorted to yelling at the child. *Id.* at 55. In response, N.H. became apprehensive of Mother but nevertheless continued with her activities. *Id.* During another episode that occurred early in the children's involvement with DHS, Mother berated then-four-and-five-year-old N.A.M. and N.J.M. by telling her daughters, "They were to blame [for being] in care, and she wished she had aborted them." *Id.* at 56. Mother's horrible outburst caused N.A.M. and N.J.M. to cry the entire trip home. *Id.* at 57.

Similarly, Mother had difficulty managing the visitations independently. *Id.* at 56. She would rely upon Ms. McFadden to help prepare food, retrieve toys, and keep the children under control. *Id.* Indeed, if the children needed comfort or support during the visitation, they sought Ms. McFadden rather than Mother. *Id.* at 56. In fact, Mother did not interact with the children during the entire visitations, electing instead to listen to music on her cellular telephone or discuss her situation with other caseworkers. *Id.* at 55.

Ms. McFadden also pointed out that throughout Mother's involvement with DHS, the juvenile court ordered super-

vised visitations and that Mother's parenting abilities never improved during that period. *Id.* at 58. Likewise, Ms. McFadden did not observe anything in Mother's behavior to suggest that she was able to control her anger or manage the children without assistance. *Id.* at 59. In sum, based upon the forty visitations Ms. McFadden supervised between Mother and the four children involved in this case, Ms. McFadden opined that in her professional capacity, Mother lacks the ability to address the children's needs independently due to her on-going substance abuse and mental health issues and she believes that terminating Mother's parental rights would be in N.A.M., N.J.M., N.H., and N.B.'s best interests.[4] *Id.* at 57, 60–61.

The current foster care manager, Kiyanna Brown, testified consistently with Ms. McFadden. Ms. Brown described an episode during August 2010 in which Mother threatened her in front of the children. *Id.* at 74. Specifically, Mother informed Ms. Brown, "[t]hat she was going to take [Ms. Brown's] kids away from [her], and make [her] lose [her] job." *Id.* When Ms. Brown attempted to terminate the visitation and remove the children from the situation, Mother followed Ms. Brown from the building, screaming in her ear. *Id.* Needless to say, the event traumatized the children, who desired to terminate the visitation early. *Id.* at 75. This incident was not an isolated event. Indeed, Mother occupied the majority of the preceding visitation repeatedly opining that she was "F* * *ing sick of DHS" trying to prevent her from seeing her children. *Id.* at 73. As with the later threats Mother leveled at Ms. Brown, Mother spewed this profanity in the children's presence. *Id.* at 74. On yet another occasion when one of the children asked Mother to identify the substances the child was allergic to, Mother exploded, "Why would I know? You haven't lived with me in three years." *Id.* at 77. Ms. Brown characterized Mother as negative and very upset and noted that her demeanor has not changed in the several months that she has been working with the family. *Id.*

In addition to describing Mother's unstable behavior during the visitations, Ms. Brown testified that Mother missed all four visitations scheduled in June and July 2010, one of the three September 2010 visitations, and both October 2010 visitations. *Id.* at 75–76. She also confirmed Mother's inattentiveness during the visitations that she did attend. *Id.* at 73. She had to prompt Mother several times to stop complaining to DHS caseworkers during the visitation and to interact with her children. Thus, consistent with Ms. McFadden, Ms. Brown opined that terminating Mother's parental rights to N.A.M., N.J.M., N.H., and N.B. was in their best interest. *Id.* at 77.

The foregoing evidence sustains the orphans' court's finding that DHS established the statutory grounds to terminate Mother's parental rights pursuant to section 2351(a)(2) due to parental incapacity that cannot be remedied. The weight of Mother's behavior since September 13, 2007 demonstrates a repeated incapacity to care for the children that caused them to be without the essential parental care, control, and subsistence necessary for their physical and mental well-being. More-

---

4. Mother attempted to rebut Ms. McFadden's testimony by introducing visitation logs that indicated only two inappropriate visits between October 2008 and June 2010. However, as Ms. McFadden explained, the agency maintained separate progress notes that de-tailed Mother's inappropriate behavior during visitations because the comment section on the visitation log was too small to maintain a detailed list of Mother's infractions. N.T., 11/4/10, at 63, 68–69.

over, mindful of Mother's erratic behavior throughout these proceedings and her inability to curb her anger or address her parenting deficiencies or even progress beyond the supervised hour-long semi-monthly visitations, we find that she will not or cannot remedy the causes of the incapacity regardless of whether or not she completed some of the programs outlined in the FSP.

Having found that the orphans' court did not abuse its discretion in concluding that CYS proved, by clear and convincing evidence, that termination of Mother's parental rights was warranted pursuant to section 2511(a)(2), we next address whether the involuntary termination of parental rights would best serve N.A.M., N.J.M., N.H., and N.B.'s developmental, physical, and emotional needs and welfare pursuant to subsection 2511(b). Mother contends that the orphans' court erred in failing to perform an adequate needs and welfare analysis. Mother's complaint is predicated upon the court's reliance on Ms. McFadden's and Ms. Brown's testimony regarding the quality of the parent-child relationships that Mother shares with the children. Although Mother concedes that neither expert testimony nor a formal bonding analysis is required to assess the parent-child relationships, she asserts that the caseworkers' testimony herein was not sufficient to establish clear and convincing evidence that terminating her parental rights best serves the children's needs and welfare. Mother's brief at 23–24. For the following reasons, we disagree.

■ In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super.2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In addition, we instructed that the orphans' court must also discern the nature and status of the parent-child bond, with ut-most attention to the effect on the child of permanently severing that bond. *Id.* However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super.2008).

■ While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 533–536 (Pa.Super.2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super.2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa.Super.2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa.Super.2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

■ Herein, the caseworkers who interacted with the children directly and supervised Mother's contacts with the children since 2007 both testified unequivocally that terminating Mother's parental

rights was in N.A.M., N.J.M., N.H., and N.B.'s best interests. While neither caseworker specifically addressed the quality of the respective parent-child bonds, Ms. McFadden opined that terminating Mother's rights would not cause the children to suffer irreparable harm. *Id.* at 62. She further noted that all of the children are content in their pre-adoptive foster homes. *Id.* Likewise, Ms. Brown not only reiterated Ms. McFadden's position that the children are happy in the pre-adoptive homes, she also observed that termination would provide the needed stability in the children's lives that Mother is incapable of providing. *Id.* at 77–78. In fact, Mother's erratic behavior during visitations actually caused the children emotional harm. *Id.* at 78. The certified record reveals that the children do not look to Mother to provide comfort, support, or security and although they actively avoid interacting with Mother when she is upset, they often bear the consequences of her behavior.

Thus, mindful that the needs and welfare analysis is reviewed on a case-by-case basis and with consideration of the intangible factors that we outlined in *In re K.Z.S. supra,* and *In re A.S., supra,* such as the love, comfort, security, and stability the children enjoy with their respective foster parents and the importance of continuing those beneficial relationships upon their wellbeing, we find sufficient evidence in the record to sustain the orphans' court's determination that terminating Mother's parental rights was in the children's best interest. *See* N.T., 11/6/10, at 61–62.

Decrees affirmed.