J-S03032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 714 WDA 2024 |

Appeal from the Order Entered May 14, 2024
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  63-23-1632

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 715 WDA 2024 |

Appeal from the Order Entered May 14, 2024
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  63-23-1631

BEFORE:  KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: May 15, 2025**

J.D. ("Father") appeals from the orders entered by the Washington County Orphans' Court ("orphans' court") granting the petitions to terminate his parental rights to K.D., born October 2022, and M.D., born May 2019

(collectively "Children"), pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (b).[1] We affirm.

Washington County Children and Youth Social Service Agency ("Agency") first became involved with the family[2] in December 2021 after Mother was involved in a car accident and found to be under influence of drugs. Both Mother and Father (together, "Parents") had substance abuse issues, and Father had been in and out of prison. The Agency ordered both Mother and Father to get drug tests. Mother attempted to falsify the test. Ultimately, Mother tested positive for PCP and fentanyl. Father did not take a drug screen. M.D. was placed in kinship care and was later returned to Parents in July 2022 and court supervision ceased in October 2022.

The Agency subsequently received two referrals, one informing it of K.D.'s birth and one in December 2022 regarding Parents' substance abuse. On January 5, 2023, Washington County Adult Probation took Mother into custody after she tested positive for several illicit substances and was found in possession of drug paraphernalia at a drug and alcohol evaluation. Mother

---

[1] The orphans' court entered separate orders terminating the parental rights of Children's mother, J.M. ("Mother"). Mother has filed a separate appeal from that decision.

[2] Mother has a child, C.A., with another father. C.A. was initially part of the dependency proceedings involving Children. However, the Agency withdrew its petition to terminate parental rights as to C.A. during the termination hearing of Children. N.T., 4/29/2024, at 7.

admitted that she and Father had been using crack cocaine since K.D.'s birth. The Agency also had domestic violence concerns in Parents' home.

The Agency requested that Father report to Washington County Drug Testing Center to submit to drug testing. Father did not comply. The Agency then went to the family's residence, where Father admitted to using crack cocaine, but refused to submit a drug test because he did not want to incriminate himself. The Agency received a verbal emergency custody authorization in January 2023, and the Children were placed in kinship care. Ultimately, Children were placed with M.P. ("Foster Mother") and A.P. (together, "Foster Parents") in February 2023. Subsequently, on February 23, 2023, Father reported to probation and testified positive for fentanyl, cocaine, and methadone.

After the Agency filed a dependency petition, the orphans' court held an adjudication hearing on March 1, 2023. At the time of the hearing, Mother and Father were in inpatient drug and alcohol treatment. Additionally, Father was on probation through Washington County, and he had recently relapsed and needed further treatment for substance abuse. The orphans' court found Children to be dependent, and ordered Father to complete in-patient treatment and follow all recommendations; comply with testing; comply with in-home service providers; complete parenting classes; follow terms of probation; and refrain from criminality. The orphans' court also determined

that Father was entitled to supervised visits twice a week upon his release from treatment.

On July 18, 2023, the orphans' court held a permanency review hearing, and found Father was in substantial compliance with the permanency plan and had made moderate progress toward alleviating the circumstances that led to Children's removal. Mother was in substantial compliance with the permanency plan and had made substantial progress. The court ordered that Father could have supervised visitation with Children twice a week for up to three hours. The court also directed Father to complete domestic violence counseling in addition to its previously stated requirements. On August 24, 2023, the orphans' court entered an order reducing Mother's visitation to two supervised, two-hour visits per week because Father had been improperly attending her visits with Children, in contravention of its order.

On October 13, 2023, the Agency filed separate petitions seeking to terminate Father's parental rights to Children under sections 2511(a)(1), (2), (5), and (b). The orphans' court held two days of hearing on the termination petitions in April 2024, at which, inter alia, Justin Faloshey ("Faloshey"), an Agency caseworker, Dr. Neil D. Rosenblum, a clinical psychologist, Father, and Diane Patterson, a volunteer at court-appointed special advocate, testified.[3]

---

[3] Attorney Erin Dickerson entered her appearance as counsel for Children. Attorney Dickerson also indicated that she is Children's guardian ad litem ("GAL"), and that there was no conflict of interest in her ability to represent
*(Footnote Continued Next Page)*

Ultimately, the orphans' court terminated Father's parental rights under sections 2511(a)(2), (5), and (b). Father filed a timely notice of appeal. Both Father and the orphans' court complied with Pennsylvania Rule of Appellate Procedure 1925.

Father raises the following questions for our review:

A.    Whether the [orphans'] court erred in admitting Dr. Neil Rosenblum's interactional evaluation, where Rosenblum did not evaluate Father yet opined as to whether adoption is in the [C]hildren's best interests?

B.    Whether the [orphans'] court erred in admitting Dr. Neil Rosenblum's interactional evaluation, where Rosenblum violated ethical standards of the American Psychological Association under 9.01 Bases of Assessments and therefore failed to utilize[] generally accepted practices?

C.    Whether the [orphans'] court erred in admitting Dr. Rosenblum's interactional evaluation where Rosenblum never concluded his findings to a reasonable degree of psychological certainty?

D.    Whether the [orphans'] court erred in allowing the GAL to recall Dr. Rosenblum prior to the Agency resting in their case in chief?

E.    Whether the [orphans'] court erred by granting the petition to involuntarily terminate parental rights under 23 Pa.C.S. [§] 2511(a)(2)(5), and (b)[?]

F.    Whether the [orphans'] court erred in not allowing counsel to explore in detail the lack of visitation with Father while

_____

both the best and legal interests of Children. N.T., 4/29/2024, at 5; N.T., 4/4/2024, at 9; *see also In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (stating that "where an orphans' court has appointed a GAL/[c]ounsel to represent both the child's best interests and legal interests, appellate courts should review sua sponte whether the orphans' court made a determination that those interests did not conflict").

incarcerated and to question whether Father's previous counsel and or the Agency failed in setting up Father's visits?

Father's Brief at 5 (issues reordered).

### **Dr. Rosenblum's Testimony**

We will address Father's first three claims together. Father contends that the orphans' court erred in admitting Dr. Rosenblum's interactional evaluation as he did not evaluate Father, but opined that adoption was in Children's best interests. Father's Brief at 39, 49. Father argues that the trial court abused its discretion in admitting Dr. Rosenblum's "interactional evaluation" because Dr. Rosenblum never evaluated Father. Father's Brief at 39. To that end, Father argues that Dr. Rosenblum could not provide his opinion that K.D. has not bonded with Father without evaluating Father or citing to psychological authority to support such a claim. *Id.* at 43-44, 47-49. Similarly, Father argues that Dr. Rosenblum violated the ethical standards of the American Psychological Association ("APA") by failing to utilize generally accepted practices. *Id.* at 39-42. Father claims that his counsel questioned Dr. Rosenblum on his methodologies and compliance with the APA Standards 9.01 — Bases for Assessments, as Dr. Rosenblum failed to cite any scientific studies to support his opinion or express that his opinion was based on a reasonable degree of psychological certainty. *Id.* at 39, 42-43, 45-47, 49. Based on this alleged failure by Dr. Rosenblum, Father asserts that the orphans' court should have disregarded his report and testimony. *Id.* at 43.

Father further notes that the orphans' court did not indicate the weight it gave to Dr. Rosenblum's opinion. *Id.* at 49-50.

As an initial matter, Father frames his arguments as pertaining to the admissibility of Dr. Rosenblum's report. The record reflects, however, that no report issued or authored by Dr. Rosenblum was admitted into evidence. This claim is therefore wholly meritless.

To the extent Father intended to argue that the orphans' court erred by considering Dr. Rosenblum's expert opinion, Father's challenge pertains to the weight the court attributed to Dr. Rosenblum's testimony, not its admissibility. *See* Father's Brief at 43-44; *see also Commonwealth v. Smith*, 181 A.3d 1168, 1186 (Pa. Super. 2018) (a claim challenging the reliability of testimony implicates the weight of the evidence).

As the trier of fact, the orphans' court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re N.A.M.*, 33 A.3d 95, 99 (Pa. Super. 2011). We give deference to the orphans' court's credibility and weight determinations if they are supported by the record. *Id.*

The orphans' court addressed Father's contentions concerning Dr. Rosenblum as follows:

> [Father's] counsel had [a] full and complete opportunity to cross-examine and challenge the findings, conclusions[,] and opinions of Dr. Rosenblum. [The orphans' c]ourt was in the best position to establish and weigh the credibility of such findings, conclusions[,] and opinions. Additionally, once the testimony and evidence was elicited at [the] hearing, [] Father had opportunity

to present further evidence and testimony to contrast, contradict[,] or challenge such testimony and failed to do so. Nevertheless, these issues were examined, explored[,] and argued during the [termination] [h]earing. Dr. Rosenblum testified that he had not evaluated Father and positioned his testimony with this foundation. Th[e orphans' c]ourt, being in the best position to evaluate such testimony afforded it the weight deemed appropriate in reaching the ultimate conclusions and findings in this matter.

Orphans' Court Opinion, 6/17/2024, at 3-4 (unnumbered).

The record reflects that Dr. Rosenblum conducted an interactional evaluation with Children with Foster Parents, an individual evaluation of Mother, and an interactional evaluation of Mother and Children. N.T., 4/4/2024, at 166-67. Dr. Rosenblum expressly testified that he did not conduct any evaluation of Father. *Id.* at 175, 181; *see also id.* at 175 (noting there was no attempt to schedule an evaluation with Father because Father was in prison). Dr. Rosenblum stated that he did not have an opinion as to Father's attachment to Children because he did not have firsthand knowledge of his relationship with Children or his parenting skills. *Id.* at 175, 182, 202.

Father's counsel queried Dr. Rosenblum on his methodology in reaching his conclusion that K.D. had no attachment to either parent given the lack of evaluation with Father. *Id.* at 178-79, 182. Dr. Rosenblum indicated that a child does not develop an attachment if the child only lived with someone for the first two months of their life. *Id.* at 179, 186-87. Dr. Rosenblum noted that "attachment is a multi-year process." *Id.* at 179; *see also id.* at 181 (further noting that K.D. had been placed in Erie for a few months and there

were gaps in visits during Father's periods of incarceration and rehabilitation). Dr. Rosenblum testified that he based this conclusion on extensive clinical experience and disagreed with the premise that attachment is critical within the first year of birth, reiterating this case involved a child who was removed at two months old. *Id.* at 180-81. Father's counsel questioned Dr. Rosenblum about Rule 9.01 of the Ethical Standards of Psychologists Code of Conduct regarding assessments and, in particular, the need to assess Father, to which Dr. Rosenblum responded that K.D.'s removal from the home at two months of age established she did not have attachment to either parent. *Id.* at 185-87. Dr. Rosenblum further highlighted that in rendering his recommendation, he relied upon the January 2023 shelter order, the adjudication order, Father's and Mother's criminal histories, Father's active magistrate summary, the CASA report, and information provided by Mother and C.A. about the family dynamics and substance abuse issues of both parents. *Id.* at 200-01.

The record supports the orphans' court's findings. *See C.M.*, 255 A.3d at 358. Father asks this Court to assign no weight or credibility to Dr. Rosenblum's testimony. However, Dr. Rosenblum openly acknowledged that he had not evaluated Father, and the orphans' court found that Dr. Rosenblum based his testimony on the lack of an evaluation of Father. Nevertheless, Dr. Rosenblum expressed his attachment conclusion with reasonable certainty, based on extensive clinical experience, that no bond is formed given K.D.'s

removal from the home at two months old.[4] *See Rolon v. Davies*, 232 A.3d 773, 777 (Pa. Super. 2020) (noting that experts are not required to use magic words such as a reasonable degree of medical certainty, and an expert's use of less definite language "does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty"); *see also* Pa.R.E. 705 ("If an expert states an opinion the expert must state the facts or data on which the opinion is based."). Thus, the orphans' court's credibility determinations are supported by the record, and we decline Father's request that we reweigh the evidence or interfere with the court's credibility determinations. *See N.A.M.*, 33 A.3d at 99. Therefore, Father's claims in this regard are without merit.

Father further argues that the trial court abused its discretion in failing to disregard Dr. Rosenblum's opinion testimony as his methodology in reaching his conclusions was not generally accepted by psychologists as required by *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *See* Father's Brief at 40-44.

> The *Frye* standard … is used to determine the admissibility of novel scientific evidence, and is incorporated into Rule 702 [of the Pennsylvania Rules of Evidence]. *Frye* permits novel scientific evidence to be admitted at trial if the methodology that underlies the evidence has general acceptance in the relevant scientific community.

---

[4] Notably, Father elicited some of Dr. Rosenblum's opinions on cross-examination.

***Commonwealth v. Jacoby***, 170 A.3d 1065, 1090 (Pa. 2017) (internal citations and quotation marks omitted). The burden is on the party opposing the scientific evidence to demonstrate that the science relied upon by the expert witness is, in fact, "novel[,] … *i.e.*, that there is a legitimate dispute regarding the reliability of the expert's conclusions." ***Commonwealth v. Bonnett***, 239 A.3d 1096, 1102 (Pa. Super. 2020) (internal quotation marks and citation omitted).

The record reflects that Father did not raise this argument at the hearing until after Dr. Rosenblum testified and never filed a motion to exclude Dr. Rosenblum's testimony. N.T., 4/29/2024, at 13. Father asked the orphans' court on the record to take "judicial notice" of the APA guidelines, but declined the orphans' court's invitation to introduce an expert to provide any testimony in support of his contention. ***Id.*** at 14. The trial court refused to take judicial notice and denied Father's request. Based upon these facts, we do not find the orphans' court abused its discretion in denying Father's ***Frye*** motion.[5]

### Recalling Dr. Rosenblum as Witness

Next, Father asserts that the orphans' court erroneously allowed Attorney Dickerson to recall Dr. Rosenblum as a witness during the hearing. Father's Brief at 45. However, Father acknowledges there was no error and

---

[5] Moreover, as noted above, Dr. Rosenblum's opinion as it related specifically to Father was highly circumscribed.

effectively abandons this issue on appeal. *Id.* Therefore, we will not address this claim.

### Termination of Parental Rights

Father next challenges the orphans' court's substantive decision to terminate his parental rights to Children. In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does not require the appellate court to accept the [orphans'] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the [orphans'] court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (quotation marks, brackets, and citations omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis. *See C.M.*, 255 A.3d at 359. "Initially, the

focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted). If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48-49 (Pa. Super. 2024) (citation omitted).

We therefore begin our analysis under subsection(a) of the termination statute. As stated above, the orphans' court terminated Father's rights to Children pursuant to section 2511(a)(2) and (8). Orphans' Court Opinion, 8/30/2024, at 32. "This Court may affirm the [orphans'] court's decision regarding the termination of parental rights with regard to any one subsection of [s]ection 2511(a)." *In re J.F.M.*, 71 A.3d 989, 992 (Pa. Super. 2013). We focus our analysis on subsection (a)(2), which provides as grounds for termination of a parent's rights:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental

- 13 -

well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

Termination of a parent's rights pursuant to section 2511(a)(2) requires that the petitioner show, by clear and convincing evidence, that the parent is presently unable to care for the child and will not be able to care for him for the foreseeable future. *Int. of A.R.*, 311 A.3d 1105, 1112 (Pa. Super. 2023).

> A child has a right to a stable, safe, and healthy environment in which to grow, and the child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting. When a parent has demonstrated a continued inability to conduct her life in a manner conducive to providing a safe environment for a child, and the behavior is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

*Id.* at 1111.

Father argues that the orphans' court abused its discretion in terminating his parental rights. Father's Brief at 27. He contends that the Agency failed to provide clear and convincing evidence that he was incapable of caring for Children, that Children were without essential care due to his incapacity, and the causes of the incapacity would not be remedied. *Id.* at 32-33. Father asserts that although he had periods of incarceration, he was set to enter a halfway house at the time of the termination hearings and it could be reasonably assumed he would return to his home in a reasonable amount of time. *Id.* at 32. Father also highlighted that he was progressing on his substance abuse issues, which showed he is willing to remedy his

incapacity. *Id.* at 32, 33. Father claims that the visitation summaries establish that he is affectionate with Children and provides appropriate emotional support to them. *Id.* at 32.

The orphans' court provided the following explanation for its decision to terminate Father's parental rights under section 2511(a)(2):

> The facts of the present case support that both parents have had repeated and continued periods of incapacity, either through incarceration, addiction or treatment causing the Children to be without essential parental care, control or subsistence necessary, as required by the Act. During the times of incapacity, care of the [] Children has been taken care of by the placement provider. Further, despite repeated services, [Father] continue[s] to struggle with the issues and behaviors that form the foundation of the dependency cases. This pattern was reflected through the testimony and evidence presented by the Agency that establishes years of similar actions. Based on the foregoing, th[e orphans' c]ourt finds that the Agency has established grounds for termination under [section] 2511(a)(2).

Orphans' Court Opinion, 5/14/2024, at 3.

The record supports the orphans' court's conclusion. Faloshey testified that he has been assigned to Children since July 2021. N.T., 4/4/2024, at 36-37. Faloshey indicated that the family first came to the Agency's attention in December 2021, because of Mother's car accident while under the influence of drugs, and her subsequent positive drug test. *Id.* at 39. Faloshey testified that M.D. was placed in foster care. *Id.* at 40. At the time, Father was ordered to participate in drug and alcohol evaluation, submit to random drug testing, participate in an individual psychological evaluation, and complete domestic violence counseling. *Id.* at 42. Faloshey noted that Mother and Father had

- 15 -

made progress with their goals and court supervision was terminated in October 2022. *Id.* at 44-45, 83. The Agency became involved with the family, however, in December 2022, based on a report that Mother was using illicit substances. *Id.* at 45. Subsequently, Mother admitted that she and Father had been using crack cocaine since K.D. was born. *Id.* at 47. As a result, the Agency requested Father submit to drug testing. *Id.* Father refused to submit to testing, as he was on probation at the time, but admitted to using crack cocaine. *Id.* at 47-48. On January 6, 2023, the Agency received emergency authorization to take custody of Children; they were placed in kinship care. *Id.* at 48. The Agency also had domestic violence concerns between Mother and Father. *Id.* at 48, 140-41, 144-45. Faloshey stated at the time Children were adjudicated dependent, Father was receiving inpatient treatment at Spirit Life Rehab. *Id.* at 52-53, 55. As part of his permanency plan, Father was ordered to attend and maintain inpatient treatment with a drug and alcohol provider and follow all recommendations; be compliant with random drug testing; comply with in-home service providers; maintain safe and stable housing; refrain from criminality; complete nurturing parent substance abuse curriculum; and maintain compliance with in-home services. *Id.* at 55.

In July 2023, C.A. alleged Father had grabbed him and thrown him down the stairs. *Id.* at 59. Faloshey indicated that Father was in substantial compliance with his goals and had made moderate progress at the permanency hearing in July 2023. *Id.* at 59-60, 111. At that time, Father

was receiving outpatient treatment. *Id.* at 60. The court ordered Father to continue with supervised twice-weekly visits. *Id.* at 60. Subsequently, both parents relapsed, with Father admitting he relapsed on July 18, 2023. *Id.* at 61-62, 63. Father violated his probation because of his drug use and was placed back in prison from August 30, 2023, until October 19, 2023, and then again from November 20, 2023, until January 17, 2024. *Id.* at 63, 66, 147. In the interim, in October, Father was in Gateway Rehab. *Id.* at 62.

Faloshey noted that Father was never permitted unsupervised visitation. *Id.* at 70-71, 123. Faloshey stated that Father would attend visits with Mother in the home in violation of a court order related to abuse allegations by C.A. against Father. *Id.* at 60-61, 134-35. Faloshey indicated that Father has not provided financial support for Children. *Id.* at 71. He testified that Father was a loving father to Children during his supervised visits and displayed appropriate parenting. *Id.* at 93, 108, 109. However, Faloshey concluded that the conditions that necessitated initial placement have not been alleviated, finding Father could only maintain his sobriety while he was incarcerated. *Id.* at 76-77, 138. Patterson testified that biological parents have not demonstrated any ability to care for Children. N.T., 4/29/2024, at 175. Additionally, Patterson confirmed that Foster Mother takes M.D. to therapy and any doctor's appointments—Father does not attend. *Id.* at 162-63, 165. Likewise, Foster Mother set up appointments for early intervention services for K.D. and ensured K.D. attended the appointments. *Id.* at 165-

66. She further highlighted that Foster Mother assists Children in day-to-day activities, engages Children in community activities, and that neither Father nor Mother engage in such activities. *Id.* at 164-65. Patterson testified that she did not believe either Mother or Father demonstrated an ability to provide for Children. *Id.* at 175.

Father testified regarding his criminal sentences— including his multiple convictions between June 2018 through August 2023—and rehabilitation stays, as well as his periods of sobriety. *Id.* at 20, 22-23, 64-68. Father noted that he visited with K.D. on her birthday, and that his visits with Children were "great." *Id.* at 24. He reported that he completed parenting and domestic violence classes. *Id.* at 24-25, 40, 47.

Father acknowledged that he relapsed after the July 18, 2023 permanency hearing, describing his relapse as "self-sabotage." *Id.* at 25, 26, 27. Father further admitted that he was in violation of his probation and went to prison on August 30, 2023. *Id.* at 27, 44. He stated that he was at Gateway Rehabilitation starting on October 17, 2023, but was unsuccessfully discharged after he allegedly punched another patient. *Id.* at 28-29, 44-45. As a result of his unsuccessful stint at Gateway, he went back to prison. *Id.* at 46.

Father indicated that he was aware M.D. was receiving therapy but had not spoken to the therapist. *Id.* at 51. Father further admitted that although he knew K.D. had eye issues, he did not attend any eye appointments for K.D.

*Id.* at 51-52.  Father last visited M.D. in August and K.D. in October.  *Id.* at 52.  However, Father testified that Children should wait for two more months, which would be the completion of his sentence in a halfway house.  *Id.* at 59-60.

Based on our standard of review, we conclude that the evidence of record supports the orphans' court's determination that Father is not able to presently parent Children and will be unable to do so for the foreseeable future.  *See A.R.*, 311 A.3d at 1112.  The evidence establishes "incapacity" under section 2511(a)(2) because Father has failed to demonstrate an ability to remedy the problems that led to Children's placement.   Father acknowledges his addiction issues, which he had not resolved at the time of the termination hearing.  Further, Father failed to establish any stability in his life, as he has been in and out of prison and rehabilitation programs.  Although Father has attempted to straighten out his life and has requested more time to gain stability, Children's lives cannot be placed on hold or put in harm's way on the hope that Father will gain the ability to handle parenting responsibilities.  *See id.* at 1111.  At the time of the termination hearing, Children had been in care for approximately sixteen months, and for M.D., this was the second time in foster care, having previously been removed from Parents' care for seven months based upon the same concerns.  We therefore find no abuse of discretion in the orphans' court's finding that the Agency

presented clear and convincing evidence in support of termination pursuant to section 2511(a)(2).

We next consider whether the record supports the orphans' court's conclusion that there was clear and convincing evidence to terminate Father's rights pursuant to section 2511(b). Section 2511(b) provides:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

Our analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *T.S.M.*, 71 A.3d at 267. "[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *Id.* (quotation marks omitted). It is not enough that there exists a bond between parent and child to avoid termination. *See Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). Rather, the orphans' court must determine whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* at 1105-06. Focusing upon the "child's development, and mental and emotional health," the orphans' court should assess whether severing the bond "is the kind of

loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.* at 1110-11.

Additionally, "the parental bond is but one part of the overall subsection (b) analysis[.]" *Id.* at 1113. The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id.* Importantly, "[orphans'] courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id.*

Thus, a court must examine the matter from the child's perspective, placing his "developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* at 1105. "[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *T.S.M.*, 71 A.3d at 268-69. The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. *K.T.*, 296 A.3d at 1105.

Father argues that M.D. has "some connection" with Father. Father's Brief at 36. He notes that the orphans' court made no finding as to the effect of severing his bond with Children. *Id.* at 36, 37. Father notes that two of the witnesses never observed visits between Father and Children, that his interactions and visits with Children between May and August 2022, were positive, and that Children acknowledge him as their dad. *Id.* at 36-37.

With respect to its needs and welfare analysis, the orphans' court explained:

> Here, [Children's] safety, security, daily needs and overall physical, mental and emotional needs are cared for by the Foster Parents. While [the orphans' c]ourt has no doubt that Mother and Father truly love[] their Children, testimony and evidence do not support the conclusion that maintaining the present relationship is in the best interests of the Children. This evaluation is made considering the continuity of relationships and the physical, developmental[,] and emotional needs of the Children.
>
> Based on the evidence presented and the testimony provided during the two-day proceeding[,] th[e orphans' c]ourt finds that the Agency has met [its] burden by clear and convincing evidence under [section] 2511(b). The testimony and evidence establish that while the Children have some connection to [Father] …., the daily needs of the Children are regularly and consistently met in the placement home. The Children seek out [F]oster [P]arents for their needs, in a home where they are part of a moderately large, loving and caring family that extends into their church community. The evidence unequivocally establishes that the best interest of the [C]hildren is served by allowing them to maintain continuity, consistency and care in the placement home and being able to achieve permanency through adoption.

Orphans' Court Opinion, 5/14/2024, at 7-8.

The record confirms the orphans' court conclusion. Faloshey testified that Children have been in Foster Parents' care since February 2023. N.T.,

4/4/2024, at 72. He indicated that Foster Mother takes the Children to their medical appointments and Foster Parents meet all Children's needs. *Id.* at 73-74. He emphasized that Children are "very attached" to Foster Parents. *Id.* at 75. Faloshey indicated Children were happy at Foster Parents' home and are bonded with Foster Parents. *Id.* at 106, 147-49; *see id.* at 149, 151 (noting that M.D. calls Foster Parents mom and dad and looks to them for emotional support); *id.* (stating that K.D. has a particularly strong attachment to Foster Parents). He testified that M.D. has trauma therapy two times a month, and attended other developmental therapies, and that Foster Mother initiated these therapies. *Id.* at 124-27. He further stated that Foster Parents are very organized, meet all Children's needs, and that Foster Mother homeschools M.D. *Id.* at 149-50. Faloshey also testified that Father has not provided financial support to Children, provided for their daily needs, or participate in intervention services for K.D.. *Id.* at 71-72, 127-28. Faloshey was of the view that termination was in Children's best interests. *Id.* at 77.

Dr. Rosenblum testified that Children have a bond with Foster Parents. *Id.* at 170, 188, 189. Dr. Rosenblum highlighted Children had been in Foster Parents' care for a year when he conducted the evaluation, and that they were doing very well, and getting help with their developmental and mental health concerns. *Id.* at 170. Dr. Rosenblum stated that Foster Parents provide attention, care, and emotional nurturance to Children. *Id.* at 188-89. Dr.

Rosenblum emphasized that Foster Mother homeschools Children and is very loving in her relationship with Children. *Id.*

Patterson testified that she visited Children at the Foster Parents' home. N.T., 4/29/2024, at 158. She indicated Children called Foster Mother "mom," and that M.D. is particularly attached to Foster Mother. *Id.* at 159, 171. Additionally, Foster Mother has facilitated visitation between M.D. and his other siblings. *Id.* at 172-73. She further testified that M.D. exhibited concerning behavior after visits with Mother and Father, including throwing up, diarrhea, and other stress-related behavior. *Id.* at 166-67. Patterson noted that Children have not exhibited sadness in not seeing their biological parents. *Id.* at 176-77. Patterson testified that Foster Parents demonstrated a commitment to Children, provide them with stability and loving care, and Children would be traumatized if removed from Foster Parents' care. *Id.* at 175-76. She acknowledged, though, that she could not make a finding as to Father's attachment to Children because he has been incarcerated or in rehabilitation during visits. *Id.* at 168, 185.

Father testified he has a bond with Children. *Id.* at 23, 24. Father emphasized he loved his Children. *Id.* at 32, 34.

Based on the record before us and the standard of review we must employ, we discern no abuse of discretion in the orphans' court's conclusion that Children are bonded to the Foster Parents, that they best meet Children's needs and welfare, and that Children will not be irreparably harmed by

terminating Father's parental rights. **See K.T.**, 296 A.3d at 1113. Further, the evidence demonstrates that Father did not engage in a caregiving role or meet Children's developmental needs. **See In re P.Z.**, 113 A.3d 840, 852 (Pa. Super. 2015) (finding termination of parental rights supported under section 2511(b) where child was familiar with parent, but no attachment existed and parent did not have a history of engaging in a caregiving relationship with child or taking responsibility for child over an extended period). The Agency presented evidence that Children were bonded with Foster Parents, loved them, called them mom and dad, and severing this bond would not be in Children's best interests.

In contrast, the record contains little indication of any bond that exists between Father and Children, and no evidence that he provides for their needs or welfare. The record clearly reflects Foster Parents' continued and unwavering dedication to addressing Children's physical, emotional, mental, educational and physical needs, and despite his best efforts, Father's inability to parent Children. **See In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (noting that a parent's "own feelings of love and affection for [children], alone, do[es] not prevent termination of parental rights."); **see also Interest of M.E.**, 283 A.3d 820, 839 (Pa. Super. 2022) (noting that orphans' court does not have to consider the bond between parent and child "over all other needs and welfare considerations"). Thus, we conclude that the orphans' court did not err or abuse its discretion in determining that Children's developmental,

emotional, and physical needs and welfare are best met by terminating Father's parental rights. The orphans' court's determination pursuant to section 2511(b) is supported by the record, and we must affirm the orders terminating Father's parental rights to Child. *See C.M.*, 255 A.3d at 358-59.

**Visitation Evidence**

In his final issue, Father contends that the orphans' court erred in not allowing his counsel to explore the lack of Children's visitation with Father while he was incarcerated and whether the Agency failed to set up such visits. Father's Brief at 37-38. Father argues that such evidence would be relevant to a section 2511(a)(5) analysis. *Id.* at 38. Father claims that counsel should have been permitted to ask questions as to whether he requested visitation while in prison. *Id.*

As stated above, we have determined that the evidence established termination of Father's parental rights under section 2511(a)(2). Therefore, to the extent the orphans' court erred by failing to allow Father's line of questioning concerning the lack of visitation, or failed to consider this evidence under section 2511(a), the claim is moot.[6]

Orders affirmed.

Judge Kunselman joins the memorandum.

---

[6] We further note that the orphans' court found that "Father's lack of visitation was not a substantive factor leading to [its] ultimate decision." Orphans' Court Opinion, 6/17/2024, at 3 n.1 (unnumbered).

Judge Sullivan files a dissenting memorandum.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

5/15/2025