J-S36001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 682 WDA 2025 |

Appeal from the Order Entered May 8, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000107-2024

BEFORE: PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.: **FILED: DECEMBER 1, 2025**

B.R. ("Father") appeals from the May 8, 2025 order entered in the Court of Common Pleas of Allegheny County Orphans' Court involuntarily terminating his parental rights to J.J.R. ("Child")[1] (d.o.b. October 2023).[2] After our careful review, we affirm.

Allegheny County Office of Children, Youth and Families ("CYF") became involved with Mother and Child's half-siblings in 2021. CYF was still involved

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court found that there was no conflict in counsel from KidsVoice being appointed as both Child's legal counsel and Guardian Ad Litem. **See** N.T., 5/2/25, at 5. Child's counsel filed a brief on Child's behalf agreeing that termination of Father's parental rights best serves Child's needs and welfare. **See** Appellee's Brief, 8/26/25.

[2] The orphans' court also terminated the parental rights of A.N. ("Mother"). Mother has not appealed.

when Mother gave birth to Child's older sibling, V.R., in 2022. Father is V.R.'s biological father. CYF removed V.R. from Mother and Father's care and terminated their parental rights to V.R. on March 12, 2024.

In the meantime, in October 2023, CYF received a referral reporting that Mother gave birth to Child, who was born with withdrawal symptoms and tested positive for cocaine, cocaine metabolites, and benzodiazepines. *See* N.T., 5/2/25, at 16; Order, 10/13/23. Father was at the hospital for Child's birth, although he left before CYF arrived, allegedly because police told him to leave the premises due to his outstanding warrants. *See id.* at 74. Mother was arrested at the hospital. CYF obtained an Emergency Custody Authorization for Child, and a week later, the juvenile court granted CYF permission to place Child in an appropriate kinship or foster home upon discharge from the hospital. *See* Order 10/13/23. Approximately ten days later, Child was placed in the foster home of C.P. and D.P. ("Foster Parents"), in whose custody he has remained throughout this case. Foster Parents live next-door to V.R.'s adoptive parent, who is V.R.'s and Child's aunt, i.e. Father's sister. *See* N.T., 5/2/25, at 19; Order, 11/22/23. The court appointed Foster Parents as Child's medical and educational decision-makers. *See id.*

After a November 22, 2023 dependency hearing, the court declared Child dependent and maintained placement with Foster Parents. Despite notice and the orphans' court's attempt to call Father during the hearing, he failed to appear. *See* Order, 11/22/23. The juvenile court made findings as to

the conditions requiring placement, which included the parents' unavailability, and Father's need to participate in recommended levels of substance abuse treatment, establish and maintain sobriety, develop and maintain a relationship with Child, and demonstrate parenting ability. *See id.* Child has never been in Father's custody.

Despite diligent efforts to locate Father, the first contact CYF had with him was not until after Father had been arrested on June 28, 2024, when Child was approximately eight months' old. CYF caseworker Ronnie Tustin met with Father virtually at the Allegheny County Jail ("ACJ"), on August 15, 2024, where Father advised Tustin that he believed he was Child's father and he would like to see Child, but he wanted paternity testing. *See id.* at 23-24, 50, 67. Thereafter, on the September 20, 2024, nearly one-year after Child's birth, Father participated in a permanency review hearing for the first time. *See* Order, 9/10/24. Following the hearing, the juvenile court ordered Father to participate in paternity testing and to meet with CYF to discuss service goals, case planning, and possible visitation.

Father was released from jail on November 21, 2024. CYF filed the petition to involuntarily terminate Father's parental rights ("TPR") on November 26, 2024. *See* N.T., 5/2/25, at 17, 25. Father appeared at the December 10, 2024 permanency review hearing, which was continued because Father requested counsel, who entered her appearance on January 14, 2025. *See* Continuance Order, 12/10/24.

Father was served with the TPR petition on January 3, 2015. The court held a TPR hearing on May 2, 2025. CYF presented the testimony of (1) Vanessa Tom, CYF caseworker; (2) Debra Snider, Casework Supervisor, A Second Chance; and (3) licensed psychologist Beth Bliss, PhD. Father testified on his own behalf.

At the beginning of the TPR hearing, CYF's counsel advised the court that the results of an April 8, 2025 genetic testing report confirmed that Father is Child's biological father. *See id.* at 7-8, 15. CYF caseworker Vanessa Tom testified she was assigned to Child's family's case in August 2024. *See id.* at 16. She explained that CYF has been involved with the family since 2021 due to situations involving Child's older siblings. *See id.* Father's history includes substance abuse concerns, legal issues, failure to maintain contact with CYF and an older sibling, and one prior involuntary termination of parental rights ("TPR") for an older sibling. *See id.*

Tom testified that, prior to the filing of the TPR petition, Father had not requested any visits with Child, had not participated in either paternity testing or case planning, did not participate in any random urine screens, and had not addressed the conditions that led to Child's removal. *See id.* at 18-19. Despite the fact that he had known Foster Parents for 15 years, prior to the TPR petition being filed, Father did not have any contact with Child, either inquire about Child or attend his medical appointments, and was unaware of concerns about Child's possible developmental delays or the services Child was

receiving. *See id.* at 18-19. Father did not send the Child any cards, letters, gifts or support. *See id.* at 18.

Months after the TPR petition was filed, Father visited Child for the first time on January 23, 2025, twenty days after being formally served with the petition. Father finally completed the substance abuse evaluation, and started treatment a week prior to the May 2, 2025 termination hearing. *See id.* at 28, 33.

CYF has concerns about Child's potential developmental delays, and Foster Parents are ensuring Child receives the proper services. *See id.* at 19-20. Tom stated that she visits the Foster Home every 30 days and has observed that Foster Parents are very attentive to Child's needs and show him appropriate affection. *Id.* at 20. Similarly, Child is very affectionate with Foster Parents. Child has nearly daily contact with his brother, V.R., who lives next door. *See id.* at 21. Tom stated Foster Parents are a pre-adoptive resource, and CYF has never had any concerns about them. Conversely, Father has not been involved in Child's medical care and Child has never been in Father's care. *See id.*

Tom explained that CYF was requesting Father's parental rights be terminated because Child has been in Foster Parents' care his entire life, and therefore his foster home is the only home he has ever known. *See id.* at 22. Foster Parents ensure Child is receiving his services, is medically up to date, and that Child remains in communication with his siblings. There is a bond

between Foster Parents and Child. *See id.* at 22. Conversely, Tom did not believe Father was in a position to care for Child because, prior to the TPR petition being filed, Father had no contact with Child and was not addressing his court-ordered goals. *See id.*

On cross-examination Tom acknowledged that one of the reasons for Child's removal from the home was parents' unavailability and that, since his release from prison, Father is no longer unavailable. *See id.* at 28. She also agreed that Father had been compliant with his goals, but not until after the TPR petition had been filed. For example, Father attended a drug and alcohol evaluation for which CYS referred him on February 18, 2025, and Father was seeking treatment through Jade Wellness program, with no indicated relapse. *See id.* at 28-29. Tom confirmed Father visits weekly with his son, there are no concerns at these visits, and Child does not appear to be frightened or to act as if Father was a stranger to him. *See id.* at 29. Finally, Tom stated CYF has determined parenting classes and coaching parenting classes are not required because Father demonstrates that he is capable of parenting tasks. *See id.* at 29-30. However, it should be noted that all these things occurred after the TPR petition's filing.

Licensed psychologist Beth Bliss, Psy.D., testified at the TPR hearing that she conducted psychological evaluations of Child's family on March 25, 2025 to help guide treatment and permanency planning. She completed an individual psychological evaluation of Father. *See id.* at 47-48. The doctor

noted that Father presented as "cooperative for the most part, but he was very defensive and unwilling to discuss his historical substance abuse concerns." CYF Exhibit 6, at 7. For example, Father disclosed to Dr. Bliss that he previously used crack and powder cocaine but was unwilling to provide any further details. *See* N.T. Hearing, 5/7/25, at 38-39. Father admitted he was not in any drug and alcohol treatment at that time because he did not like attending the classes, although he recognized he needed to attend. *See id.* at 38-39. Father also told Dr. Bliss he had a heart condition for which he needed to have an EKG, but he had yet to schedule it due to frustration with the automated phone system. Dr. Bliss diagnosed Father with substance use disorder—cocaine, and a provisional diagnosis of anti-social personality disorder, as there was some evidence that he met the criteria for diagnosis, but there was insufficient evidence to make that diagnosis at the time. *See id.* at 39-40.

Dr. Bliss testified she did not believe Father was in a position to care for Child for several reasons. Specifically, Dr. Bliss strongly recommended Father complete substance abuse treatment to obtain the necessary tools to maintain sobriety. *See id.* at 41. She stated Father also needed to receive the medical treatment necessary to ensure he is healthy enough to care for Child. *See id.* Dr. Bliss also testified that Father needs to be more involved in Child's care and specialized services to understand if he is able to meet Child's needs. *See id.* at 41-42. Finally, Dr. Bliss explained that, at the time she met with Father,

he was living between a friend's place and his mother's home, so Father needs to obtain more stable housing. *See id.* at 41-42. She was unable to determine if Father could be in the position to care for Child in the near future because of Father's defensiveness and unwillingness to discuss his substance use history or reasons for legal involvement. *See id.* at 40-41.

Dr. Bliss also conducted an interactional evaluation of Child with Father. *See id.* at 42-43. Father told her he only started visiting in January 2025. *See id.* at 43. Child appeared comfortable with Father, but Dr. Bliss noted that although Child smiled once or twice at Father and napped on him, this alone does not guarantee a bond has been established.

Finally, Dr. Bliss completed an interactional evaluation of Child with Foster Parents. Dr. Bliss observed positive parenting skills by Foster Parents. *See id.* at 43. Dr. Bliss observed that Child looked to Foster Mom as his psychological parent, seeking her comfort if he were upset, and Foster Mother was able to provide comfort and calm Child down. *See id.* at 44, 46.

Dr. Bliss opined that the involuntary termination of Father's parental rights would best meet Child's needs and welfare. *See id.* at 48. Dr. Bliss explained:

> [Child has] been in placement since birth and had minimal to no contact with anyone else initially until very recently. And then just recently has had contact with [F]ather, and at the time of my evaluation, [F]ather is not in a position to currently care for [Child]. And I wasn't able to opine whether or not he would be in the near future.

*Id.* at 58.

Dr. Bliss opined that, due to the limited nature of their relationship, there would be no significant detriment to Child if Father's parental rights were terminated, but there likely would be a negative impact on Child if he were removed from Foster Parents' care. *See id.* at 47, 58.

Debra Snider, caseworker supervisor at Second Chance, Incorporated ("SCI"), testified Child is doing well in his foster home. *See id.* at 11-12. Foster Mother is very loving and nurturing. *See id.* at 12. When Snider observed Foster Mom and Child in the foster home, Child was very attached to Foster Mom, laughing, smiling, and hugging her. *See id.* Foster Parents are a pre-adoptive resource, and SCI never has had any concerns about Foster Parents' care of Child. *See id.* at 13.

Finally, Father testified he was at the hospital when Child was born and he knew Child was placed in a safe home when he was released from the hospital because Father has known Foster Parents for approximately fifteen years. *See id.* at 73-75. Father did not communicate with CYF between the time Child was born and CYF finally located him because he was "going through a really rough time." *Id.* at 74. Father explained he requested genetic testing prior to starting visits and did not visit Child while incarcerated. *See id.* at 75-76. Father did inquire whether Child could have visited him at the jail. *See id.* at 76. Father admitted he did not reach out to Child or even ask how he was doing prior to 2025, even though he knew Foster Parents and that

they lived close to Child's brother, V.R., and V.R.'s foster parent (Child's aunt and Father's sister). *Id.* at 74-75.

At the time of the TPR hearing, Father stated he was employed and living with his mother. *See id.* at 64-65, 79. Father stated he has been clean since he was incarcerated at the ACJ on June 28, 2024, where he was involved in a twelve-step drug and alcohol program on a tablet provided to inmates. *See id.* at 67, 80. He testified he only missed one drug and alcohol screening after he was released from jail. *See id.* at 65-66. Father stated he participated in a drug and alcohol evaluation approximately two-and-a-half months before the TPR hearing, and that he started the recommended group counseling the week prior to the TPR hearing. *See id.* at 68-70. Father was on probation at the time of the TPR hearing. *See id.* at 67. Father visited with Child the day prior to the TPR hearing, bringing Child allergy appropriate food. *See id.* at 71-72. Father said that, during visits, he tries to teach 18-month-old Child by identifying colors, animals, and buildings, helps Child with walking, and changes Child's diapers. *See id.* at 72-73.

Despite his challenge to the TPR petition, Father stated he does not want Child removed from Foster Parents' home to be put in his care, as they are good parents, but he also does not want his parental rights terminated because he would like the opportunity to build a relationship with Child. *See id.* at 71, 77. If visits continue and he maintains his sobriety, Father said he could see himself being able to take care of Child sometime in the future. *See*

*id.* at 78. Father stated that, even if his parental rights were terminated, he still would like to maintain contact with Child. *See id.*

At the conclusion of the hearing, the court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2533(a)(1). Father timely appealed and filed a contemporaneous statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court filed a Rule 1925(a) opinion on July 8, 2025. *See* Pa.R.A.P. 1925(a)(ii).

Father raises two issues for this Court's review:

1. Whether the trial court abused its discretion and/or erred as a matter of law by finding that CYF met its burden of proof by clear and convincing evidence thereby granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. §2511(a)(1)?

2. Whether the trial court abused its discretion and/or erred as a matter of law in finding that CYF met its burden of proof by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the minor Child pursuant to 23 Pa.C.S. §2511(b)?

Appellant's Brief, at 7.

Our scope and standard of review are well-settled:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*Interest of R.S.A.D.*, 341 A.3d 787, 794-95 (Pa. Super. 2025) (citation omitted).

- 11 -

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of N.A.S.*, 338 A.3d 191, 196-97 (Pa. Super. 2025) (citation omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights and requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The orphans' court must first consider if termination under one of the eleven enumerated grounds in Section 2511(a) is supported by the parent's conduct. Only if the court determines that the petitioner has established grounds for termination under Section 2511(a), will the court then assess the petition under Section 2511(b), which focuses on the needs and welfare of the child. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). A court only will involuntarily terminate a parent's rights if the petitioner satisfies both

Sections 2511(a) and (b) by clear and convincing evidence. ***See***

***Interest of N.A.S.***, 338 A.3d at 197.

Instantly, the court terminated Father's parental rights pursuant to 23

Pa.C.S.A. § 2511(a)(1) and (b), which provide:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>>
>> …
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

"Section 2511(a)(1) [analysis] focuses on the conduct of the parent

sustained for at least a six-month period prior to the filing of the petition,

which reveals a settled purpose of relinquishing parental claim to a child or a

failure to perform parental duties." ***Interest of N.A.S.***, 338 A.3d at 197

(citation omitted).

Parental duty is best understood in relation to the needs of the child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty, which requires affirmative performance. Parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with their physical and emotional needs.

*Id.* at 198 (citation, ellipses, and brackets omitted).

"Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, a three-part inquiry follows: (1) the parent's explanation for her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." *Id.* (ellipses, citation, and internal quotation marks omitted "To be legally significant, the post-abandonment contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to undertake the parental role. The parent wishing to re-establish [her] parental responsibilities bears the burden of proof on this question." *Id.* (citation omitted).

As to the effect of a parent's incarceration on the court's consideration of a termination petition, this Court has explained that:

Incarceration alone is not sufficient to support termination of parental rights under any subsection. [. . . A] parent's

- 14 -

responsibilities are not tolled during incarceration, and[,] therefore[, the court] must inquire [into] whether the parent utilized those resources available while he or she was in prison to continue a close relationship with the child.

\* \* \*

[Moreover, i]n cases involving an incarcerated parent, this Court has emphasized that a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. The parent wishing to reestablish his parental responsibilities bears the burden of proof relative to postabandonment contact.

*In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) (en banc)

(citations, quotation marks, and brackets omitted).

Instantly, in concluding the record contained clear and convincing evidence supporting terminating Father's parental rights to Children, the orphans' court thoroughly explained its ruling to Father:

So in terms of key dates here, we know that the TPR petition was filed [on] November 26th of 2024. The relevant six[-]month period then would have stated May 26th of 2024, although I can certainly look earlier than that, and will. And regarding the exclusion, the date of notice of the TPR petition, [Father] was personally served with the TPR petition on January 3rd of 2025.

So what I am going to do now is review the facts that have been established that led me to conclude that CYF has proven its case and that[, Father], you haven't met the requirement of a parent to take that place of importance and maintain that relationship and communication.

… [W]e know that [Child] was born October … 2023. And we know [Father] knew that day—you knew that you had a child [and where Child was placed].

\* \* \*

- 15 -

… [You] share[d] with us that [Foster Parents] are great people. That they are doing a great job taking care of [Child]. That … you've known them for many years. They're near your sister, which will give [Child] a chance to know his brother. … [You recognized] that he was safe and being well taken care of. What it also tells me though [is] that there isn't a time in the life of [Child] that you couldn't have done more. …

\* \* \*

… [A]t a permanency review hearing … on January 16th of 2024, my findings … indicate that [Father]'s sister , who was the foster parent to the older sibling[,] had heard from [Father] by phone [in] October [2023] that [Child] had been born. [Father], as you told me, following the birth of your child, you didn't make any effort of any kind to be in touch with your child, to be in touch regularly with your sister or with [Foster Parents,] to find out how [Child] was doing.

You explained you were going through a rough time. You had things in your life that you needed to straighten out, and that's where your focus was. And you may have been right that you weren't in a condition to be a day-to-day parent to [Child]. … But in term of what the law requires of a parent, you were not doing those things.

So you became incarcerated at the end of June. So now we're [into] that six month period. At the time you became incarcerated, I have no evidence before me that suggests that you got in touch with CYF or your sister or [Foster Parents] once you became incarcerated. What I do know … is that CYF became aware that you were incarcerated. … So that was July. Ms. Tustin was the worker at the time and made arrangements to meet with you. … [Father], you did say [at that time] that you would be interested in visiting [Child]. You also said you wanted to confirm by paternity testing that he was your child. … I respect the choice, but you didn't have to make that choice. If you wanted to start a relationship with [Child] right then and there, you could have said so. And [Ms.] Tustin would have done her best to arrange whatever form of contact could be arranged … while you were incarcerated. And we have got plenty of parents incarcerated visiting with children. … [It] is not perfect[, b]ut [it] definitely happens.

- 16 -

… September [2024] … was another permanency review hearing[.] … And that was the first time, [Father], that you participated in one of the hearings. …

The TPR [petition] was filed [on] November 26th. … [Y]our release from [] jail … was right around the same time. And … notice of the TPR [petition] itself occurred on January 3rd. … [T]he first visit with [Child] … was January 23rd of 2025 … because the goal was still reunification. But they started after [Father] had received notice of the filing of the TPR petition. And I heard testimony today that those visits have gone well and that [Child] is comfortable with you, [Father]. And that's to your credit. And Dr. Bliss acknowledged that as well.

But the law tells me to disregard that when assessing whether grounds to terminate rights exist. … [T]he only effort that I have evidence of that you exerted, [Father], during the whole time from the birth of [Child] through to your awareness that a TPR petition had been filed was the general statement of interest in [] having visits[,] but after the testing confirmed your paternity. And that is simply nowhere near the level of commitment, dedication and interest that the law requires.

So I want to speak about some of the things that a parent can do[ b]ecause we are talking about an infant. … [Y]ou … could [not really] have phone calls with [Child, … a]lthough phone calls could have been set up or videos where you could have seen [Child]. But here are things you could have done. A parent can send letters. … [Child] is not going to read them [now]. But [when Child] is old enough to read [them he can]. … [L]etters … photos … pictures. These are things that some parents do. And these are things that are within a parent's control. None of that happened. … [P]arents can send gifts. And given that you have a relationship with both your sister and to some degree [Foster Parents] .. [it] probably [would] not have been hard to do regular check-ins to find out how's he doing? What's going on with him? How's his health? But I don't have evidence that any of that happened. None of it.

Okay. So I think enough said. I believe that the grounds [for establishing Section 2511(a)(1) were proven. …

N.T. Hearing, 5/2/25, at 96-102 (unnecessary capitalization omitted; some paragraph formatting provided). We discern no abuse of discretion.

Essentially, the orphans' court found that Father was absent from Child's life until January 2025, which was months after the TPR petition had been filed and weeks after he received notice, thus failing "to take and maintain a place of importance in [Child's] life," without any explanation that the court found convincing. N.T., 5/2/25, at 96. The record supports the orphans' court's findings.

First, we note that the record completely belies Father's claim that the orphans' court considered only the six months immediately preceding the filing of the TPR petition. The orphans' court expressly stated it would consider the entirety of the litigation since Child's birth, and indeed did so, for example it specifically noted that Father was at the hospital when Child was born, so as of "that day[ Father] knew [he] had a child." *Id.* at 95. Instead of remaining there in his parental role, Father left the hospital before CYF arrived and failed to perform any parental duties for Child so he could focus on getting his life in order. *See* N.T., 5/2/25, at 17, 75. He evaded CYF's attempts to reach out to him and, within the six-month look-back window, when Child was nearly ten months of age, CYF finally was able to track Father down in jail. *See id.* at 23. At that time, Father first stated a vague interest in visiting with Child, and requested paternity testing. *See id.* at 24. Thereafter, Father did nothing to take a place of importance in Child's life until **after** he received notice that the

TPR petition had been filed[3]. Therefore, the record supports the orphans' court's finding that CYF proved the grounds for termination of Father's parental rights pursuant to Section 2511(a)(1) by clear and convincing evidence, where Father did nothing to maintain a place of importance in Child's life until after the TPR petition was filed, without any convincing explanation.

We next consider the court's finding that termination was warranted pursuant to Section 2511(b). Under Section 2511(b), the orphans' court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. **See** 23 Pa.C.S.A. § 2511(b). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005). However, the "mere existence of an emotional bond does not preclude the termination of parental rights." **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011).

In addition to examining the parental bond, the court must consider other important factors, including "the child's need for permanency and length of time in foster care," "whether the child is in a pre[-]adoptive home and bonded with foster parents," and "whether the foster home meets the child's

---

[3] Notably, not only did Father did not visit with Child until after receiving notice of the TPR petition, he did so before he participated in, and received the results from, paternity testing, which belies any argument that Father actually doubted he was Child's biological father in the first place.

developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023).

Here, the orphans' court concluded termination of Father's parental rights would be in Child's best interest. It considered that Child has been in the foster care system, and specifically Foster Parents' home, his entire life, and that the Foster Home is a pre-adoptive resource. The court explained Child needs permanency and that Foster Home provides for Child's developmental, physical, and emotional needs, including his need for love, comfort, security, safety, and stability. The court noted the strong bond between Child and Foster Parents and that, even assuming some level of bond had been created between Child and Father, severance of that bond would not have a negative impact on Child because of Father's failure to maintain a primary role in Child's life. *See* N.T., 5/2/25, at 103-04.

The record supports the court's findings. Tom testified that Child has never been in Father's care and that Father is not involved in Child's medical care. *See id.* at 21. Tom did not believe Father was in a position to care for Child. *See id.* Similarly, Dr. Bliss testified that, after conducting an individual evaluation of Father and an interactional evaluation of Father and Child, she did not believe Father was in a position to care for Child, not only because Father needs to complete substance abuse treatment, but also because Father needs to be more involved in Child's medical and specialized services to

understand if he could even meet Child's needs. *See id.* at 41-42. While Child smiled at Father and was comfortable falling asleep on him, Dr. Bliss opined this did not guarantee a bond had been established, since Father had only visited with Child since January 2025 for the first time in Child's life. *See id.* at 43.

Dr. Bliss also conducted an interactional evaluation between Child and Foster Parents. Dr. Bliss observed positive parenting skills by Foster Parents and that Child looked to Foster Mom as his psychological parent, seeking her comfort when upset, and Foster Mom was able to provide comfort and calm Child down.

Dr. Bliss opined the involuntary termination of Father's parental rights would best meet Child's needs and welfare. Child had been in placement with Foster Parents since birth, Child only recently has had contact with Father, and, due to the nature of that limited relationship there would be no significant detriment to Child if Father's parental rights were terminated, but there likely would be a negative impact if Child were removed from Foster Parents' care. *See id.* at 47, 58. In fact, at the time of the TPR hearing, Father still was not seeking to assume full parental responsibility for Child. He testified he did not want Child removed from Foster Parents' home to be put in his care because they are such good parents and Child is comfortable there. *See id.* at 71, 77.

Based on the foregoing, the orphans' court properly found that CYS established by clear and convincing evidence that termination of Father's

parental rights would best serve Child's best interests because it would provide him with the permanency and security he deserves.

Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/1/2025